JUDGE BUCHWALD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CIV 9606

COPY

---

SECURITIES AND EXCHANGE COMMISSION,

                *Plaintiff,*

    -v.-                                  Case No._____

OLEKSANDR DOROZHKO

                *Defendant,*

---

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER, AN ORDER FREEZING ASSETS AND GRANTING OTHER RELIEF, AND AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

Plaintiff Securities and Exchange Commission ("SEC") submits this memorandum in support of its application (1) for a temporary restraining order; (2) an order freezing assets and granting other relief; and (3) an order to show cause why a preliminary injunction should not issue against Defendant Oleksandr Dorozhko ("Defendant" or "Dorozhko"), a Ukrainian national who made highly suspicious and lucrative purchases of out-of-the-money and at-the-money put options on the common stock of IMS Health Incorporated ("IMS Health" or the "Company") just hours before IMS Health issued a negative earnings announcement. The emergency application and the SEC's Complaint in this matter are necessitated by the Defendant's violations of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] ("Exchange Act") and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder, and the significant likelihood that he will further attempt to dissipate, transfer, and secrete the proceeds from his fraudulent activities beyond the jurisdiction of the United States.

## **SUMMARY**

After the market closed on October 17, 2007, IMS Health reported third quarter earnings of $0.29 per share, which was 28% below the analysts' consensus estimates of $0.40 earnings per share and 15% below the previous year's third quarter earnings of $0.34 per share. As explained below, within hours of the market close on October 17, while in possession of material nonpublic information, Defendant Dorozhko purchased 300 Oct 25 out-of-the-money and 330 Oct 30 at-the-money IMS Health put options at a cost of $41,670.90. He sold all of his put options the next day and realized proceeds of $328,571.00 and profits of $286,456.59.

The SEC seeks emergency relief in order to freeze Defendant Dorozhko's assets in his brokerage account at Interactive Brokers LLC ("Interactive Brokers") before Defendant Dorozhko has an opportunity to transfer them outside of the United States where the assets would be difficult, if not impossible, to recover. Absent an immediate order freezing the accounts, there is a substantial danger that there will be no assets remaining in this country to satisfy any potential judgment obtained by the SEC against Defendant Dorozhko, who is a Ukrainian national living in Uzhgorod, Ukraine.

To prevent Defendant Dorozhko from moving his assets outside this Court's jurisdiction, the SEC has brought this action expeditiously and without an opportunity to conduct a complete investigation. Nevertheless, the circumstantial evidence uncovered so far strongly suggests that Defendant Dorozhko traded in IMS Health put options while in possession of material nonpublic information about the Company's negative third quarter earnings announcement. The accompanying Complaint charges Defendant Dorozhko with violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

Accordingly, the SEC seeks a temporary restraining order, an order freezing assets in Defendant Dorozhko's brokerage account at Interactive Brokers, an order for an immediate and sworn accounting of, *inter alia*, the Defendants' assets, an order for expedited discovery, an order authorizing alternative means of service of process, an order preventing document alteration or destruction, and an order to show cause why a preliminary injunction should not issue.

## STATEMENT OF FACTS

Defendant Dorozhko is a self-employed Ukrainian national residing in Uzhgorod, Ukraine. (Gumagay Decl. ¶ 3 and Ex. B; Gumagay Decl. ¶ 4 and Ex. C). Uzhgorod is a city in western Ukraine with a population of about 100,000. In his application to open an account at Interactive Brokers, Defendant Dorozhko referred to his occupation as an "independent engineering consultant for the energy producing industry." (Gumagay Decl. ¶ 4 and Ex. C). He represented that he had a net income of approximately $45,000-$50,000 and a net worth of about $100,000-$250,000. (Id.).

While it appears that Defendant Dorozhko began the process of opening an account at Interactive Brokers in September 2007, on or about October 4, 2007, Defendant Dorozhko wire transferred $42,500 to Interactive Brokers to open an online trading account. (Gumagay Decl. ¶ 4-5 and Ex. C-D). He made the wire transfer from the Central European International Bank Limited and the funds were transferred to Interactive Brokers' account at Citibank, N.A., in New York, New York. A few days later, on October 10, 2007, Defendant Dorozhko's trading account was opened by Interactive Brokers' affiliate located in the United Kingdom. (Id.).

On October 17, 2007, within hours of the close of the market, Defendant Dorozhko purchased 300 Oct 25 out-of-the-money and 330 Oct 30 at-the-money IMS Health put options at

3

a cost of about $41,670.90. (Gumagay Decl. ¶ 7 and Ex. F). According to information provided to the SEC staff by the Chicago Board Options Exchange, Defendant Dorozhko's put option purchases represented almost 90% of all customer purchases in those option series during the period between September 4, 2007, and October 17, 2007. On October 17, 2007, IMS Health's stock closed at $29.56 per share and the trading volume was 832,500 shares. (Gumagay Decl. ¶ 2 and Ex. A).

Shortly after the market closed on October 17, 2007, IMS Health reported third quarter earnings of $0.29 per share, which was 28% below the analysts' consensus estimates of $0.40 earnings per share and 15% below the previous year's third quarter earnings of $0.34 per share. (Gumagay Decl. ¶¶ 8-9 and Exs. G-H).

When the markets opened the following day, October 18, 2007, IMS Health's stock price plummeted to a low of $21.20 per share, 28% lower than the previous day's closing price. (Gumagay Decl. ¶ 2 and Ex. A). This was the steepest decline in the stock's trading history. On October 18, 2007, IMS Health's stock closed at $23.12 per share, a decline of approximately 22% from the previous day's closing price. (Id.). The trading volume was more than 23 million shares, representing a staggering 2,735% increase in trading from the previous day's trading volume. (Id.).

During the chaotic market activity in IMS Health stock, Defendant Dorozhko sold all of the 630 IMS Health put options that he had purchased on October 17, 2007, and realized proceeds of $328,571.00 and profits of $286,456.59. (Gumagay Decl. ¶ 10 and Ex. I). Dorozhko's trades in IMS Health put options were the only trades in his account at Interactive Brokers.

Upon discovering the suspicious trading in Defendant Dorozhko's account, Interactive Brokers temporarily restricted withdrawals and transactions in the account, but only until the firm completes its investigation. Defendant Dorozhko attempted to access funds held in his account at Interactive Brokers on October 19, 2007, and October 22, 2007. (Gumagay Decl. ¶ 11 and Ex. J). After failing to access his account, in online chat sessions with customer service representatives at Interactive Brokers, Defendant Dorozhko stated that his lawyer would contact Interactive Brokers' compliance department. (Gumagay Decl. ¶ 11 and Ex. J, p. 8). In one online chat session with Interactive Brokers, Defendant Dorozhko wrote, "I do not like if I cant access to my money and take positions every time I want." (Gumagay Decl. ¶ 11 and Ex. J, p. 4).

## ARGUMENT

For the reasons set forth below, the relief sought by the SEC, including a temporary restraining order and a preliminary injunction barring the Defendant from further violations of the federal securities laws, as well as an asset freeze and other equitable relief, is necessary and appropriate to protect investors and is in the public interest.

## I.   THIS COURT HAS JURISDICTION OVER THE CASE AT BAR

United States courts have subject matter jurisdiction over the SEC's proposed civil action pursuant to Sections 21(d), 21(e), 21A and 27 of the Exchange Act. This Court has recognized that "the Securities Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." SEC v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990) (citations omitted). A court may exercise personal jurisdiction "over a defendant whose 'conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" Id. (quoting World-Wide Volkswagen Corp. v.

5

Woodson, 444 U.S. 286, 297 (1980)). "One circumstance making such anticipation reasonable is where a defendant has acted in such a way as to have 'caused consequences' in the forum state." Id. (citing Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326, at 1340 (2d Cir. 1972)).

Certain of the acts, practices, transactions, and courses of business that the SEC alleges occurred in the United States. For example, although Defendant Dorozhko traded in IMS Health put options on the Chicago Board Options Exchange, the value of those put options is directly tied to the value of the underlying common stock, and IMS Health's common stock is traded on the New York Stock Exchange, located in New York, New York. Additionally, IMS Health options are traded on the American Stock Exchange LLC and the International Securities Exchange, both located in New York, New York. Certain of Defendant Dorozhko's trades in IMS Health put options were executed on the International Securities Exchange. Finally, the proceeds from Defendant Dorozhko's illegal trading are held at Citibank, N.A., a financial institution located in New York, New York. In light of these facts, Defendant Dorozhko should reasonably have anticipated being hailed before this Court, and it is appropriate for this Court to exercise personal jurisdiction over him.

## II. THE PRESENT APPLICATION SATISFIES THE STANDARD FOR AN ASSET FREEZE AND A PRELIMINARY INJUNCTION

Since the SEC is "not ... an ordinary litigant, but ... a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary relief is less than that of a private party. SEC v. Management Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975). The SEC need not show irreparable injury or a balance of equities in its favor. Id. at 808-809; see also, SEC v. Unifund SAL, 910 F.2d 1028, 1036 (2d Cir. 1990).

*Asset Freeze*

Courts have frequently granted asset freezes in cases involving illegal trading where there was a concern that the defendant might dissipate assets or transfer assets beyond the jurisdiction of the United States. See, e.g., SEC v. Kan King Wong and Charlotte Ka On Wong Leung, 07 Civ. 3628 (S.D.N.Y. May 8, 2007) ($23 million asset freeze); SEC v. Sonja Anticevic, 05 Civ. 6991 (S.D.N.Y. Aug. 5, 2005) (court freezes $2 million in assets from timely call option trading by Croatian resident); SEC v. One or More Unknown Purchasers of Call Options and Common Stock of USCS Int'l, Inc., 98 Civ. 6327 (S.D.N.Y. Sept. 8, 1998) (asset freeze). When there are concerns that defendants might dissipate assets, or transfer or secrete assets beyond the jurisdiction of the United States, courts in the Second Circuit need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze order. See Unifund SAL, 910 F.2d at 1041 (where "[t]here is a basis to infer that the ... [defendants] traded on inside information, and while the Commission is endeavoring to prove at trial the requisite element of trading in breach of a fiduciary duty of which the defendants were or should have been aware, the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged."). In fact, in Unifund SAL, the Court upheld an asset freeze order notwithstanding the fact that it found the evidence insufficient to uphold the entry of a preliminary injunction. See Id.

In this case, there is a well-founded basis for concluding that Defendant Dorozhko may attempt to remove assets beyond the jurisdiction of this Court. Since Mr. Dorozhko resides overseas, the SEC is concerned that he might try to move his assets beyond the reach of this Court. Such movement of assets may make it difficult for the SEC to secure appropriate relief in this proceeding. The SEC is particularly concerned that once Defendant Dorozhko becomes aware of the SEC's lawsuit, he will make arrangements to transfer his assets outside the

7

jurisdiction of the United States. Indeed, he has already attempted to access illicit trading proceeds held in his account at Interactive Brokers. The SEC reasonably believes that he intends to remove those assets from the United States. Where, as here, there are concerns that a defendant might dissipate, transfer, or secrete assets beyond the jurisdiction of the United States, this Court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze order. Id. Accordingly, the relief requested by the SEC is appropriate. See, e.g., CFTC v. Rodriquez, 2006 US Dist. Lexis 13773 (S.D.N.Y. 2006) (asset freeze and other relief).

*Preliminary Injunction*

"[T]he standards of public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief." Unifund SAL, 910 F.2d at 1035-36 (quoting Hecht Co. v. Bowles, Price Adm'r, 321 U.S. 321, 331 (1944)). Accordingly, the SEC need not show risk of irreparable injury or the unavailability of remedies at law. See 910 F.2d at 1036. Rather, the Commission is entitled to entry of temporary and preliminary injunctive relief against future securities law violations upon "a substantial showing of likelihood of success as to both a current violation and the risk of repetition." SEC v. Cavanagh, 155 F.3d 129, 132 (2d Cir. 1998) (citing Unifund SAL, 910 F.2d at 1039-1040).

As explained in Section III., below, the circumstances surrounding Defendant Dorozhko's trading in IMS Health put options suggest that he traded while in possession of material nonpublic information with scienter. Thus, there is a substantial likelihood that the SEC will be successful in establishing Defendant Dorozhko's liability under the antifraud provisions of the federal securities laws. Indeed, the facts suggest that Defendant Dorozhko acted with a high degree of scienter, and that he is likely to repeat his violations absent injunction. See, e.g., SEC v. Shapiro, 494 F.2d 1301, 1308 (2d Cir. 1974) (first-time offenders are not immune from injunctive relief).

III. **STRONG CIRCUMSTANTIAL EVIDENCE SUGGESTS THAT DEFENDANT DOROZHKO'S VIOLATED SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10b-5 THEREUNDER**

Section 10(b) of the Exchange Act and Rule 10b-5 prohibit any person from employing any device, scheme or artifice to defraud, making misrepresentations or misleading omissions, and engaging in any transaction, practice or course of business which operates as a fraud, in connection with the purchase or sale of securities. "[P]roof of scienter required in [securities] fraud cases is often a matter of inference from circumstantial evidence." Herman & MacLean v. Huddleston, 459 U.S. 375, 390-91 n.30 (1983). Uncharacteristically large, speculative, or otherwise suspicious securities trading by a defendant may be an indication of illegal trading. See, e.g., SEC v. Warde, 151 F.3d 42, 48 (2d Cir.1998) (noting that co-defendants tipper and tippee "engaged in uncharacteristic, substantial and exceedingly risky investments in [ ] warrants shortly after speaking with one another, suggesting that they discussed not only the inside information, but also the best way to profit from it"); SEC v. Willis, 777 F.Supp. 1165, 1173 (S.D.N.Y. 1991) (stating that scienter was pled sufficiently with allegation in complaint concerning "the volume and timing of the trading"); SEC v. Musella, 748 F. Supp. 1028, 1039 (S.D.N.Y. 1989), aff'd, 898 F.2d 138 (2d Cir. 1990), cert. denied sub nom. DeAngelis v. SEC, 498 U.S. 816 (1990) (inferring scienter in part from "the amounts involved and the financing of the trades").

"[A]n omitted fact is material if there is a substantial likelihood that a reasonable [investor] would consider it important in [making her investment decision]." Basic, Inc. v. Levinson, 485 U.S. 224, 231 (1988) (quoting TSC Industries Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)) (holding that the TSC Industries test also applies to actions instituted pursuant to Rule 10b-5). There is a presumption of materiality for information concerning the financial condition of a company. SEC v. Murphy, 626 F.2d 633, 653 (9th Cir. 1980). Courts traditionally

view the market's reaction to news as one indicia of materiality. In re Apple Computer Securities Litigation, 886 F.2d 1109, 1116 (9th Cir. 1989), cert. denied, 496 U.S. 943 (1990) (dramatic price movements in response to optimistic statement provide strong indication that statement was material). A sudden increase in the stock price upon the public release of information is evidence that the information is material to investors. See, e.g., Warde, 151 F.3d at 47 (the materiality of the information was confirmed by the fact that the stock price jumped when the information was made public). Information is public when it has been "effectively disclosed in a manner sufficient to insure its availability to the investing public." SEC v. Texas Gulf Sulphur, 401 F.2d 833, 854 (2d Cir. 1968), en banc, cert. denied, 394 U.S. 976 (1969).

The circumstantial evidence developed by the SEC to date provides more than sufficient basis for inferring that Defendant Dorozhko knowingly or recklessly traded while in possession of material nonpublic information. Among other things, Defendant Dorozhko, a Ukrainian national, (1) opened his account about a week before his option trades; (2) transferred $42,500 into his account (nearly a full year of his income) and used $41,670.90 of those funds to purchase IMS Health put options; (3) purchased risky "out-of-the-money" and "at-the-money" put options just days before they expired; (4) traded just hours before IMS Health's negative third quarter earnings announcement; and (5) has made no other trades in this account.

A put option is a contract that provides the buyer the right, but not the obligation, to sell an agreed quantity of an underlying security by a date (the expiration date) for a certain price (the strike price). Thus, the buyer of a put option generally expects the market price for the underlying security will decline, allowing the buyer of the put option to make a profit from the difference between the strike price (less the cost of the option) and the lower market price. Put options are considered to be "out-of-the money" if the strike price is less than the market price of the underlying

10

security, and "at-the-money" if they are the same. American-style option contracts expire on the Saturday following the third Friday of the month, but the Friday is the more significant date as it is the last day that equity options trade and on which an option may be exercised. Thus, Dorozhko's October series put options expired just three days after he purchased them and could only be traded for two days.

Defendant Dorozhko's put option purchases comprised almost 90% of all customer purchases in those option series, using funds nearly equivalent to his annual income, and representing about 20%-50% of his self-proclaimed net worth. Essentially, buying the put option contracts was a bet that the price of IMS Health's stock would fall below the strike price of the put contracts. This was an extremely risky bet as the 300 Oct 25 out-of-the-money contracts and 330 at-the-money Oct 30 put options he purchased on October 17, 2007, expired on October 20, 2007, and could last be traded on October 19, 2007. Defendant Dorozhko bet nearly a year's worth of his income that the price of IMS Health stock would drop dramatically within two days. Thus, the size, timing, and unusual nature of Defendant Dorozhko's purchases alone provide strong circumstantial evidence that he had advance knowledge of IMS Health's negative earnings prior to the Company's announcement.

Information regarding IMS Health's negative third quarter earnings was both material and nonpublic. On Wednesday, October 17, 2007, IMS Health's stock closed at $29.56 per share and the trading volume was 832,500 shares. After IMS Health's negative earnings announcement, on October 18, IMS Health's stock price fell to a low of $21.20 per share, 28% lower than the previous day's closing price. This was the steepest decline in the stock's trading history. IMS Health's stock closed at $23.12 per share that day, a decline of approximately 22% from the previous day's closing price. The trading volume on October 18 was more than 23 million

shares, representing a more than 2,735% increase in trading from the previous day. Clearly, when Defendant Dorozhko purchased put options (to sell IMS Health common stock), the investing public was not aware of the negative news about IMS Health's third quarter earnings. The market reaction, represented by the steep drop in the price of its stock and dramatic increase in trading volume on October 18, indicates that investors believed that information about IMS Health's third quarter earnings was material.

## IV.   THE COURT SHOULD ORDER DEFENDANT TO PROVIDE AN ACCOUNTING

The equitable remedy of an accounting is frequently imposed to provide an accurate measure of unjust enrichment and defendant's current financial resources. See SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1105 (2d Cir. 1972); SEC v. Oxford Capital Securities, Inc., 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992).

It is appropriate for this Court to issue an order requiring Defendant Dorozhko to prepare and serve upon Plaintiff SEC, within seven days, an accounting of his assets, including all proceeds of his purchases and sales of IMS Health securities from January 1, 2005, through the present, and the disposition and current location of all such proceeds.

## V.   AN ORDER GRANTING EXPEDITED DISCOVERY IS APPROPRIATE

The SEC seeks to depose witnesses, subpoena bank and brokerage records and other documents and electronic records, and take other discovery on an expedited basis prior to a hearing on a motion to continue the asset freeze during the pendency of this proceeding. Due to the SEC's recent acquisition of information about Defendant Dorozhko's trading and the immediate need to stop ongoing attempts by the Defendant to remove assets from the United States, the SEC has brought this action expeditiously before it had an opportunity to interview all persons who have information relevant to this matter. The opportunity to take discovery prior to a preliminary

injunction hearing will enable the SEC to present a more complete evidentiary record to the Court and will sharpen and focus the issues that must be decided by the Court at such a hearing. Expedited discovery will also assist the SEC in properly effectuating any order entered by this Court freezing the account in which illegal trades occurred.

### VII. AN ORDER SHOULD ISSUE PERMITTING ALTERNATIVE MEANS OF SERVICE

Rule 4(f)(3) of the Federal Rules of Civil Procedure permits the Court to authorize alternative means for service of process in foreign countries. We respectfully request that the Court authorize service upon Defendant Dorozhko by serving him via Federal Express, courier service or, alternatively, in the manner described in the SEC's proposed order, such as service through Defendant Dorozhko's agents, including Interactive Brokers through which his trades were placed and executed. Since Defendant Dorozhko resides in the Ukraine, he may not be amenable to ordinary methods of service.

### V. AN ORDER SHOULD BE ISSUED PREVENTING THE ALTERATION OR DESTRUCTION OF DOCUMENTS.

In order to protect all documents necessary for full discovery in this matter, the SEC seeks an order preventing the alteration or destruction of documents. Such "innocuous" orders are routinely granted to protect the integrity of the litigation. See, e.g., Unifund SAL, 910 F.2d at 1040 n.11.

## CONCLUSION

For the reasons set forth above, the SEC respectfully requests that this Court grant its application for a temporary restraining order and an order freezing Defendant Dorozhko's assets and granting the other relief discussed above and set forth in the SEC's proposed Order.

Dated: 10/29/7

Respectfully submitted,

_____
Robert B. Blackburn (RB 1545)
Local Counsel
U.S. Securities and Exchange Commission
13th Floor – NERO
3 World Financial Center, Room 4300
New York, New York 10281-1022
(212) 336-1050
(212) 336-1317 (Fax)

_____
Carl A. Tibbetts (Trial Counsel)
Christopher R. Conte
Charles E. Cain
Christine E. Neal
Paul A. Gumagay (PG0805)
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-4030
(202) 551-4483 (Tibbetts)
(202) 551-4443 (Gumagay)
(202) 772-9233 (Fax)