UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| *Plaintiff,* | : |
| | : |
| -*v.*- | : |
| | : |
| OLEKSANDR DOROZHKO | : |
| | : |
| *Defendant,* | : |
| | : |

Case No.  07 CIV 9606 (NRB)

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN REPLY TO DEFENDANT DOROZHKO'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND OTHER EQUITABLE RELIEF AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Securities and Exchange Commission ("SEC"), having filed a Complaint naming Oleksandr Dorozhko ("Dorozhko") as defendant, respectfully submits this <u>Memorandum of Law in Reply To Defendant Dorozhko's Opposition To Plaintiff's Motion For Preliminary Injunction And Other Equitable Relief And Opposition to Defendant's Motion to Dismiss</u> in further support of its application for an Order: (1) preliminarily enjoining violations of certain provisions of the federal securities laws; (2) preliminarily certain of the Defendant's assets; (3) directing the Defendant to account for all funds involved in the transactions set forth in the Complaint, to repatriate and deposit said funds with this Court, and to preserve additional assets equal to three times the alleged ill-gotten gains; (4) directing the gathering, retention, and preservation of evidence; (5) directing the expedited discovery and disclosure of evidence; and (6) authorizing alternative means of service as provided in Fed. R. Civ. P. Rule 4(f) and (h).

Defendant Dorozhko opposes the SEC's motion for preliminary injunction and other equitable relief for three principal reasons:[1] (1) lack of personal jurisdiction; (2) failure to state a claim; and (3) failure to plea with particularity.  By the simple fact that Defendant Dorozhko had significant contacts with, and actions had impact in, the United States, this Court has personal jurisdiction over him.  In addition, the SEC's Complaint alleges with full particularity Defendant Dorozhko's involvement in a fraudulent and deceptive scheme to steal material nonpublic information from IMS Health Incorporated ("IMS Health" or the "Company") and its agents and to exploit this information in connection with the purchase of IMS Health securities --- a fraudulent or deceptive device and contrivance --- in violation of Section 10(b) of the Securities

---

[1]     Defendant Dorozhko's has submitted his <u>Motion To Dismiss The Complaint And To Vacate The Temporary Restraining Order, An Order Freezing Assets And Granting Other Relief</u> ("Motion to Dismiss"). However, in terms of addressing Defendant Dorozhko's opposition to the SEC's motion for preliminary injunction and other equitable relief, the SEC is limited to 10-pages in its reply brief under Rule 2.C. of Your Honor's Individual Practices.  In light of this, the SEC respectfully requests that the Court allow the page limitation of a memorandum of law in support of, and in opposition to, motions to apply in this case, i.e., 25 pages under Rule 2.C. of the Individual Practices.

Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. Among other things, the Complaint alleges that Defendant Dorozhko (1) opened his account about a week before his option trades; (2) transferred $42,500 into his account (nearly a full year of his income) and used $41,670.90 of those funds to purchase IMS Health put options; (3) purchased risky "out-of-the-money" and "at-the-money" put options just days before the options expired; (4) traded just hours before IMS Health's negative third quarter earnings announcement; and (5) has made no other trades in this account.

## I.    Relevant Facts And Procedural History

Defendant Dorozhko is a self-employed Ukrainian national residing in Uzhgorod, Ukraine. (Gumagay Decl. ¶ 3 and Ex. B; Gumagay Decl. ¶ 4 and Ex. C). In his application to open an account at Interactive Brokers LLC ("Interactive Brokers"), Defendant Dorozhko represented that he had a net income of approximately $45,000-$50,000 and a net worth of about $100,000-$250,000. (Gumagay Decl. ¶ 4 and Ex. C). On or about October 4, 2007, Defendant Dorozhko wire transferred $42,500 to Interactive Brokers to open an online trading account. (Gumagay Decl. ¶ 4-5 and Ex. C-D). He made the wire transfer from the Central European International Bank Limited ("CIB Bank") and the funds were transferred to Interactive Brokers' account at Citibank, N.A., in New York, New York. By e-mail, Defendant Dorozhko provided Interactive Brokers a "Certification" from CIB Bank purportedly showing that Defendant Dorozhko had a "total available balance" that "exceeds USD 997,-" at the bank as of September 10, 2007. (Second Gumagay Decl. ¶ 2 and Ex. A; Ward Decl. ¶  and Ex. _). On October 10, 2007, Defendant Dorozhko's trading account was opened by Interactive Brokers' affiliate located in the United Kingdom. (Id.).

On October 17, 2007, within hours of the close of the market, Defendant Dorozhko purchased 300 Oct 25 out-of-the-money and 330 Oct 30 at-the-money IMS Health put options at a cost of about $41,670.90.  (Gumagay Decl. ¶ 7 and Ex. F).  According to information provided to the SEC staff by the Chicago Board Options Exchange, Defendant Dorozhko's put option purchases represented almost 90% of all customer purchases in those option series during the period between September 4, 2007, and October 17, 2007.  On October 17, 2007, IMS Health's stock closed at $29.56 per share and the trading volume was 832,500 shares.  (Gumagay Decl. ¶ 2 and Ex. A).  Shortly after the market closed, IMS Health reported third quarter earnings of $0.29 per share, which was 28% below the analysts' consensus estimates of $0.40 earnings per share and 15% below the previous year's third quarter earnings of $0.34 per share.  (Gumagay Decl. ¶¶ 8-9 and Exs. G-H).

Prior to public dissemination of IMS Health's financial results, the Company, its employees, and its agents took steps to maintain the confidentiality of the information.  (Fox Decl. ¶¶ 5-9).  For example, the Company and its agents used passwords, nonpublic electronic protocols, and encrypted Virtual Private Network connections to maintain the confidential nature of IMS Health's financial results.  (Id.).  In addition, the Company limited the number of individuals with access to the earnings information prior to its public dissemination.  (Fox Decl. ¶ 6).

When the markets opened the following day, October 18, 2007, IMS Health's stock price fell 28% to a low of $21.20 per share – the steepest decline in the stock's trading history.  (Gumagay Decl. ¶ 2 and Ex. A).  During the chaotic market activity in IMS Health stock, Defendant Dorozhko sold all of the 630 IMS Health put options that he had purchased the previous day, and realized proceeds of $328,571.00 and profits of $286,456.59.  (Gumagay Decl.

¶ 10 and Ex. I).  Dorozhko's trades in IMS Health put options were the first and only trades in his account at Interactive Brokers.

As evidenced by the market's reaction, IMS Health's third quarter earnings announcement was material to investors.  On October 18, 2007, the first trading day following the announcement, IMS Health's stock closed at $23.12 per share, a decline of approximately 22% from the previous day's closing price.  (Id.).  The trading volume was more than 23 million shares, representing a staggering 2,735% increase in trading from the previous day's trading volume.  (Id.).

On October 29, 2007, the SEC filed an emergency action against Defendant Dorozhko seeking a temporary restraining order freezing assets and granting other relief.  That same day, this Court ordered, among other things, a freeze of Defendant Dorozhko's assets, an accounting and identification of his assets, alternative means of service, and expedited discovery in anticipation of a hearing on the SEC's requested preliminary injunction scheduled for Tuesday, November 13, 2007.  (Temporary Restraining Order, An Order Freezing Assets And Granting Other Relief, And An Order To Show Cause Why A Preliminary Injunction Should Not Issue ("Court Order")).

The SEC has served several discovery requests to Defendant Dorozhko, pursuant to the Court Order, on November 5 and 6, 2007.  (Second Gumagay Decl. ¶¶ 3-5 and Exs. B-D).  Defendant Dorozhko's deposition was scheduled for Thursday, November 8, 2007, at 10:00 a.m.  The requested documents were required to be produced at the time of his deposition.  Defendant Dorozhko failed to appear for his scheduled deposition or produce any document at the required time.  In addition, Defendant Dorozhko has not satisfied his legal obligations under the Court Order, such as the accounting and identification of assets, and repatriating assets to the United

States.  Several hours after he failed to appear for his scheduled deposition, Defendant

Dorozhko's counsel notified the SEC that Defendant Dorozhko "invokes his Fifth Amendment

Right Against Self Incrimination" against certain provisions of the Court Order and all discovery

requests.  (Second Gumagay Decl. ¶ 7 and Ex. F).

On November 6, 2007, in apparent disregard of this Court's Individual Practices,[2]

Defendant Dorozhko, through counsel, filed the Motion to Dismiss and supporting papers.  No

attempts were made to confer with Plaintiff SEC's counsel prior to the filing of the Motion to

Dismiss.  In fact, Plaintiff SEC's counsel was led to believe that Defendant Dorozhko would

seek a brief adjournment in this matter.  (Second Gumagay Decl. ¶ 6 and Ex. E).

For the reasons stated below, we respectfully request this Court to grant the SEC's

request for a preliminary injunction, asset freeze, and other relief, and deny Defendant's Motion

to Dismiss.[3]

## II.     The Court Has Personal Jurisdiction Over Defendant Dorozhko

The Second Circuit has recognized that "the Securities Exchange Act permits the exercise

of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment."  SEC v.

Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990) (citations omitted).  A court may exercise

personal jurisdiction "over a defendant whose 'conduct and connection with the forum State are

such that he should reasonably anticipate being haled into court there.'"  Id. (quoting World-

---

[2]     Rule 2.A. of this Court's Individual Practices states, "For motions other than discovery motions, a pre-motion conference is required before making any motion, except motions that are required by the Federal Rules of Appellate Procedure to be made by a certain time and further except for motions to be brought on by orders to show cause, motions by incarcerated pro se litigants and motions for reargument.  To arrange a pre-motion conference, the moving party shall submit a letter not to exceed three pages in length setting forth the basis for the anticipated motion."  In addition, Rule 2.D. of this Court's Individual Practices states, "All motions shall be accompanied by a letter no longer than three pages outlining the substantive argument advanced in the motion papers."

[3]     Should the Court, however, find the Complaint deficient in any way, the SEC requests leave to amend the Complaint.

Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).  "One circumstance making such anticipation reasonable is where a defendant has acted in such a way as to have 'caused consequences' in the forum state."  Id. (citing Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326, at 1340 (2d Cir. 1972)).

The plaintiff "bears the burden of showing that the court has jurisdiction over the defendant … on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction," Aerogroup Int.'l, Inc. v. Marlboro Footworks Ltd., 956 F. Supp. 427, 432 (S.D.N.Y. 1996).  However, where, as here, there has been no discovery, "a plaintiff may defeat a motion to dismiss based on legally sufficient *allegations* of jurisdiction."  Id. (emphasis added).  The Complaint contains more than enough legally sufficient allegations of jurisdiction.  For example, in order to finance his brokerage account, Defendant Dorozhko wired $42,500 in U.S. dollars from an account at Central European International Bank Limited to an account at U.S.-based Interactive Brokers.  See Compl. ¶ 14.  The $42,500 (USD) wired by Dorozhko was received in and held at Interactive Brokers' U.S. bank account at Citibank, N.A., in New York, New York.  See id.  Moreover, Defendant Dorozhko executed trades in IMS Health put options on the International Securities Exchange, located in New York, New York.  See id. at ¶ 9.  The value of those put options is directly tied to the value of the underlying common stock of a U.S. publicly-traded company, IMS Health.  See id. at ¶ 13.  IMS Health's common stock is traded on the New York Stock Exchange, located in New York, New York.  See id. at ¶ 9.  Additionally, IMS Health options are traded on the American Stock Exchange LLC and the International Securities Exchange, both located in New York, New York.  *See id.*  Finally, the proceeds from Defendant Dorozhko's trading are held at Citibank, N.A., located in New York, New York.  See id. at ¶26.

In his Motion to Dismiss, Defendant Dorozhko misconstrues the personal jurisdiction test, asserting that the Court "lacks sufficient interest in adjudicating claims against a citizen of  a foreign country who allegedly committed acts in that country and whose future misconduct the Commission seeks to deter will necessarily occur in that [foreign] country."  Motion to Dismiss, p. 20.  Defendant Dorozhko's summary conclusion is entirely without merit.  The Court has a clear interest in identifying the means used by Dorozhko to obtain access to IMS Health's material nonpublic information maintained *only* in the United States.  Defendant Dorozhko's Motion to Dismiss also misstates the SEC's Complaint, asserting that the SEC purportedly "admits" that Dorozhko's unlawfully obtained access to IMS Health's earnings announcement "presumably occurred there [in the Ukraine]."  See Motion to Dismiss, p. 20 (citing Compl.¶ 3). This is blatantly false; the Complaint "admits" no such thing.  Even at this early stage of the litigation, it is clear that whatever unlawful means Defendant Dorozhko used to obtain IMS Health's material nonpublic information must have involved contact with the United States because IMS Health's information was *only* maintained in the United States, and on United States servers and computer networks.  (Fox Decl. ¶¶ .   Nothing in Defendant Dorozhko's Motion to Dismiss rebuts the clear indicia of contacts with the United States sufficient to confer personal jurisdiction over him.

## III.    Motion to Dismiss Is Not Appropriate In This Case

When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, the Court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in favor of the non-moving party.  See SIPC v. BDO Seidman, LLP, 222 F.3d 63, 68 (2d Cir. 2000).  The Court may grant a motion to dismiss under Rule 12(b)(6) only if "it appears beyond doubt that the plaintiff

can prove no set of facts in support of his claim which would entitle him to relief." <u>Krimstock v. Kelly</u>, 306 F.3d 40, 48 (2d Cir. 2002).  When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference. <u>Brass v. Am. Film Techs., Inc.</u>, 987 F.2d 142, 150 (2d Cir. 1993).  The complaint need only (1) include a short and plain statement of the claim showing that the SEC is entitled to relief; and (2) give defendants fair notice of what the SEC's claim is and the grounds upon which it rests. <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 512 (2002).

Moreover, on a motion to dismiss, the Complaint must be viewed in the light most favorable to plaintiff, read liberally, and allowed to proceed unless it is beyond doubt that the plaintiff can prove no set of facts entitling it to relief. <u>Desiderio v. National Ass'n of Securities Dealers, Inc.</u>, 191 F.3d 198, 202 (2d Cir. 1999).  In viewing the allegations of the Complaint, the court must give plaintiff the benefit of all reasonable inferences. <u>Griffin v. Crippen,</u> 193 F.3d 89, 91 (2d Cir.1999); <u>Dory v. Ryan</u>, 999 F.2d 679, 681 (2d Cir.1993), <u>modified on other grounds</u>, <u>25 F.3d 81 (2d Cir.1994)</u>.  Plaintiffs' "complaint must be sustained if relief could be granted 'under any set of facts that could be proved consistent with the allegations.'" <u>National Org. for Women, Inc. v. Scheidler</u>, 510 U.S. 249, 114 S. Ct. 798, 802 (1994).

Defendant Dorozhko's Motion to Dismiss mischaracterizes the nature and scope of the allegations of the SEC's Complaint.  The SEC's Complaint alleges that Defendant Dorozhko traded on the basis of material nonpublic information that he gained through fraudulent conduct. (Compl. at ¶ 3).  While Defendant Dorozhko's motion suggests that the SEC's allegation rested solely on a theory of computer hacking, the Complaint clearly alleges that the fraudulent means "***may*** include, but are not limited to, hacking into computer networks" (<u>Id.)</u> (emphasis added). Contrary to Defendant Dorozhko's assertion, the SEC broadly pled in its emergency action that

he obtained material nonpublic information through fraudulent conduct.  There are any number

of means by which he could have done so, including a more modern and unique method of

stealing information, such as hacking,[4] or more traditional methods, such as receiving a tip from

someone else in breach of a duty of trust and confidence or trading in direct violation of a duty of

trust and confidence he owed to the source of the information.

## IV.    The SEC's Complaint Pleads Fraud with Particularity

Pleading fraud with particularity under Rule 9(b) generally means that the complaint

must allege the "who, what, when, where, and how of the fraud."  See DiLeo v. Ernst & Young,

901 F.2d 624, 627 (7th Cir. 1990); see generally In re Parmalat Sec. Litig., 376 F. Supp. 2d 472,

492 (S.D.N.Y. 2005).  However, the courts have acknowledged Rule 9(b)'s limited breadth,

noting that the rule "must be read together with Rule 8(a), which requires only a short and plain

statement of the claim for relief."  SEC v. U.S. Envtl., Inc., 82 F. Supp. 2d 237, 240 (S.D.N.Y.

2000) (quoting Ouaknine v. MacFarlane, 897 F.2d 75, 81 (2d Cir. 1990)).

Under 9(b)'s pleading standards, the SEC has pled facts more than sufficient to withstand

Defendant Dorozhko's Motion to Dismiss.  The SEC has, at a minimum, satisfied Rule 9(b) by

pleading facts sufficient to show the "who, what, when, where, and how of the fraud."  Namely,

the SEC has pled that Defendant Dorozhko obtained material nonpublic information regarding

---

[4]        The cases cited by Defendant Dorozhko in the Motion to Dismiss, where he invoked insider trading theories, are not helpful to his Motion to Dismiss as they do not concern defendants who obtained material nonpublic information through fraudulent or deceptive means by the owner of the information or the owner's agents.  The focus in those cases was not the method through which defendants obtained information but whether (1) in receiving the information, the defendants had a fiduciary duty and (2) in using the information, the defendants breached that duty.  See e.g., SEC v. Switzer, 580 F. Supp. 756 (W.D. Okla. 1984); United States v. Cassese, 273 F. Supp.2d 481, aff'd on other grounds, 428 F.3d 92 (2d Cir. 2005).  In sharp contrast, the SEC alleges that Defendant Dorozhko, among other things, may have stolen material nonpublic information through deceptive means, or knowingly received stolen information and exploited it.  Indeed, "clauses (a) and (c) of Rule 10b-5 are not aimed at failures to disclose.  Rather they are *flat prohibitions of deceitful practices*…"  United States v. Charnay, 537 F.2d 341, 350 (9th Cir. 1976) (emphasis added); see also, Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 10 n. 7 (1971) ("§10(b) and Rule 10b-5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception.  Novel or atypical methods should not provide immunity from the securities laws.") (emphasis added) (citations omitted).

IMS Health's negative third quarter earnings which could *only* have been obtained through some unlawful means including, but not limited to, hacking or otherwise improperly obtaining electronic access to systems that contained this information.  See Compl.  ¶¶ 3, 12, 16, 28, 29; (Fox Decl. ¶¶ 4-14) (describing all steps taken by IMS Health to preserve the confidentiality of the earnings announcement prior to its release at 4:33 PM on October 17, 2007).

Further, the SEC has pled that Defendant Dorozhko used his account at Interactive Brokers to purchase 630 IMS Health put options for a total price of $41,670.90, hours *before* IMS Health's negative announcement, and at an average price well below the current market price of IMS Health stock.  See Compl. at ¶¶ 2, 16, 17.  In addition, the SEC has pled that when he purchased the 630 put options, Defendant Dorozhko was not part of some larger trend in the market for IMS Health options.  Instead, Defendant Dorozhko's purchase of IMS Health's put options represented nearly 90% of all customer purchases of the October 25 and October 30 option series during the month prior to IMS Health's negative earnings announcement.  See id. at ¶ 19.  Moreover, the SEC has pled that IMS Health released its third quarter earnings – earnings that were 28% below analysts' consensus estimates – after the markets closed on October 17, 2007, and after Dorozhko's earlier purchase of put options in IMS Health.  See id. at ¶ 21. Finally, the SEC has pled that on October 18, 2007, as a result of IMS Health's negative earnings announcement, IMS Health stockholders, unlike Defendant Dorozhko, lost nearly 28% in value, the steepest stock price decline in the company's trading history.  See id. at ¶ 22.  Indeed, the SEC has pled that on the same day as IMS Health's historic decline, Defendant Dorozhko used his Interactive Brokerage account to sell all of his IMS Health put options at a profit of $286,456.59.  See id. at ¶ 23.

As Defendant Dorozhko concedes, Rule 9(b)'s pleading requirements may be established by alleging facts "that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  See Motion to Dismiss at 14 (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2nd Cir. 1994)).  The facts alleged by the SEC constitute such "strong circumstantial evidence."  Requiring more at this stage of the litigation – when Defendant Dorozhko has refused to provide basic information or respond to discovery – unreasonably exceeds the requirements of Rule 9(b).  See, e.g., SEC v. U.S. Environmental, Inc., 82 F.Supp.2d 237 (S.D.N.Y. 2000) (finding Rule 9(b) satisfied and denying defendant's motion to dismiss because "[t]he Court agrees with plaintiff that defendant's demand for the pleading of detailed evidentiary matter is unreasonable at this early stage.").

The Complaint gives Defendant Dorozhko adequate notice of the facts and claims asserted sufficient to permit him to adequately prepare his response.  See SEC v. Alexander, 160 F. Supp. 2d 642, 649 (S.D.N.Y. 2001); SEC v. Naegeli, 1993 U.S. Dist. LEXIS 237, at *3 (S.D.N.Y. Jan. 12, 1993).  Even a cursory review of Defendant Dorozhko's Motion to Dismiss indicates that the SEC's Complaint provided enough notice of facts and claims to allow Defendant Dorozhko to prepare a lengthy response.  In the absence of any valid Rule 9(b) deficiencies, therefore, Defendant Dorozhko's Motion to Dismiss should be denied.

## V.  An Order of Preliminary Injunction Is Appropriate

It is the SEC's belief that it has established to the Court's satisfaction that (1) the Court has personal jurisdiction; (2) the Complaint adequately pleas claims under Section 10(b) of the Exchange Act and Rule 10b-5; and (3) these claims were pled with adequate particularity, and now the SEC would like to address the appropriateness of a preliminary injunction and other equitable relief.

Since the SEC is "not … an ordinary litigant, but … a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary relief is less than that of a private party.  SEC v. Management Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975).  The SEC need not show irreparable injury or a balance of equities in its favor.  Id. at 808-809; see also, SEC v. Unifund SAL, 910 F.2d 1028, 1036 (2d Cir. 1990).  "[T]he standards of public interest, not the requirements of private litigation, measure the propriety and need for injunctive relief."  Unifund SAL, 910 F.2d at 1035-36 (quoting Hecht Co. v. Bowles, Price Adm'r, 321 U.S. 321, 331 (1944)).  Accordingly, the SEC need not show risk of irreparable injury or the unavailability of remedies at law.  See id.  Rather, the SEC is entitled to entry of temporary and preliminary injunctive relief against future securities law violations upon "a substantial showing of likelihood of success as to both a current violation and the risk of repetition."  SEC v. Cavanagh, 155 F.3d 129, 132 (2d Cir. 1998) (citing Unifund SAL, 910 F.2d at 1039-1040).

As explained below, the circumstances surrounding Defendant Dorozhko's trading in IMS Health put options strongly suggests that he traded while in possession of material nonpublic information with scienter.  There is a substantial likelihood that the SEC will be successful in establishing Defendant Dorozhko's liability under the antifraud provisions of the federal securities laws.  Indeed, the facts suggest that Defendant Dorozhko acted with a high degree of scienter, and that he is likely to repeat his violations absent injunction.  See, e.g., SEC v. Shapiro, 494 F.2d 1301, 1308 (2d Cir. 1974) (first-time offenders are not immune from injunctive relief).

A.    Violations of the Anti-Fraud Provisions of the Federal Securities Laws

Section 10(b) of the Exchange Act and Rule 10b-5 prohibit any person from, in connection with the purchase or sale of any security, (a) employing any device, scheme or artifice to defraud;

(b) making any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.  See also, In re ZZZZ Best Sec. Lit., 864 F. Supp. 960, 968 (C.D. Cal. 1994).  Conduct is deceitful if it has the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme to defraud.  See In re Global Crossing Ltd. Sec. Litig., 322 F.Supp. 2d 319, 336-37 (S.D.N.Y. 2004).  The U.S. Supreme Court offered a simple definition describing the conduct at issue as deceptive, within the meaning of the statute, because it was not authorized or disclosed.  See SEC v. Zandford, 535 U.S. 813, 820 (2002); see also, Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 472 (1977).  Section 10(b) of the Exchange Act expansively prohibits "the use or employ . . . [of] _any_ manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors" in connection with the purchase and sale of a security.  (Emphasis added).  The legislative history of the Exchange Act emphasizes that the Act's broad scope was intended to "encompass[] all 'manipulative and deceptive practices which have been demonstrated to fulfill no useful function' S.Rep. No. 792, 73d Cong., 2d Sess., 6 (1934)."  SEC v. Materia, 745 F.2d 197, 201 (2d Cir. 1984).  Indeed, the U.S. Supreme Court has explained that Exchange Act Section 10(b) should be "construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'"  Zandford, 535 U.S. at 819 (citations omitted).

"[P]roof of scienter required in [securities] fraud cases is often a matter of inference from circumstantial evidence."  Herman & MacLean v. Huddleston, 459 U.S. 375, 390-91 n.30

(1983).[5]  Uncharacteristically large, speculative, or otherwise suspicious securities trading by a defendant may be an indication of illegal trading.  See, e.g., SEC v. Warde, 151 F.3d 42, 48 (2d Cir.1998); SEC v. Willis, 777 F.Supp. 1165, 1173 (S.D.N.Y. 1991) (stating that scienter was pled sufficiently with allegation in complaint concerning "the volume and timing of the trading"); SEC v. Musella, 748 F. Supp. 1028, 1039 (S.D.N.Y. 1989), aff'd, 898 F.2d 138 (2d Cir. 1990), cert. denied sub nom. DeAngelis v. SEC, 498 U.S. 816 (1990) (inferring scienter in part from "the amounts involved and the financing of the trades").

A fact is "material if there is a substantial likelihood that a reasonable [investor] would consider it important in [making her investment decision]."  Basic, Inc. v. Levinson, 485 U.S. 224, 231 (1988) (quoting TSC Industries Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)) (holding that the TSC Industries test also applies to actions instituted pursuant to Rule 10b-5). There is a presumption of materiality for information concerning the financial condition of a company.  SEC v. Murphy, 626 F.2d 633, 653 (9th Cir. 1980).  Courts traditionally view the market's reaction to news as one indicia of materiality.  In re Apple Computer Securities Litigation, 886 F.2d 1109, 1116 (9th Cir. 1989), cert. denied, 496 U.S. 943 (1990) (dramatic price movements in response to optimistic statement provide strong indication that statement was material).  A sudden increase in the stock price upon the public release of information is evidence that the information is material to investors.  See, e.g., Warde, 151 F.3d at 47 (the materiality of the information was confirmed by the fact that the stock price jumped when the information was made public).  Information is public when it has been "effectively disclosed in a

---

[5]      "A plaintiff is not required to produce direct evidence: 'circumstantial evidence, if it meets all the other criteria of admissibility, is just as appropriate as direct evidence and is entitled to be given whatever weight the jury deems it should be given under the circumstances within which it unfolds." United States v. Gamache, 156 F.3d 1, 8 (1st Cir. 1998), quoted in SEC v. Sargent, 229 F.3d 68, 75).  "Circumstantial evidence has no less weight than direct evidence as long as it reasonably establishes that fact rather than anything else." SEC v. Ginsburg, 362 F.3d 1292, 1297(11th Cir. 2004).

manner sufficient to insure its availability to the investing public."  SEC v. Texas Gulf Sulphur, 401 F.2d 833, 854 (2d Cir. 1968), en banc, cert. denied, 394 U.S. 976 (1969).

 B.  The SEC Is Likely To Succeed On The Merits

   The facts as pled in the SEC's complaint raise a strong inference that Defendant Dorozhko traded, with scienter, while in possession of material nonpublic information that had been obtained unlawfully, whether by hacking, breach of duty, or some other fraudulent or deceptive means. Among other things, Defendant Dorozhko, a Ukrainian national, (1) opened his account about a week before his option trades (Compl. ¶¶14, 15); (2) transferred $42,500 into his account (nearly a full year of his income) and used $41,670.90 of those funds to purchase IMS Health put options (id. at ¶¶14, 16); (3) purchased risky "out-of-the-money" and "at-the-money" put options just days before they expired (id. at ¶¶ 2, 16-18); (4) traded just hours before IMS Health's negative third quarter earnings announcement (id. at ¶¶2, 16-17, 21); and (5) has made no other trades in this account. (Id. at ¶18).

   A put option is a contract that provides the buyer the right, but not the obligation, to sell an agreed quantity of an underlying security by a date (the expiration date) for a certain price (the strike price). Id. at ¶13.  Thus, the buyer of a put option generally expects the market price for the underlying security will decline, allowing the buyer of the put option to make a profit from the difference between the strike price (less the cost of the option) and the lower market price.  Id. Put options are considered to be "out-of-the money" if the strike price is less than the market price of the underlying security, and "at-the-money" if they are the same.  Id.  American-style option contracts expire on the Saturday following the third Friday of the month, but the Friday is the more significant date as it is the last day that equity options trade and on which an option may be

exercised.  Id.  Thus, Dorozhko's October series put options expired just three days after he purchased them and could only be traded for two days.

Defendant Dorozhko's put option purchases comprised almost 90% of all customer purchases in those option series, using funds nearly equivalent to his annual income, and representing about 20%-50% of his self-proclaimed net worth.  Id. at ¶¶2, 18-19.  Essentially, buying the put option contracts was a bet that the price of IMS Health's stock would fall below the strike price of the put contracts prior to their expiration.  This was an extremely risky bet as the 300 Oct 25 out-of-the-money contracts and 330 at-the-money Oct 30 put options he purchased on October 17, 2007, expired on October 20, 2007, and could last be traded on October 19, 2007.  Id. at ¶17.  In essence, Defendant Dorozhko bet nearly a year's worth of his income that the price of IMS Health stock would drop dramatically within two days.  Thus, the size, timing, and unusual nature of Defendant Dorozhko's purchases alone provide strong circumstantial evidence of Defendant Dorozhko's scienter and that he had advance knowledge of IMS Health's negative earnings prior to the Company's announcement.

Information regarding IMS Health's negative third quarter earnings was both material and nonpublic.  IMS Health took numerous steps to maintain the confidentiality of its earnings announcement prior to its planned release to investors after the market closed on October 17, 2007. (Fox Decl. ¶¶ 4-14).  Defendant Dorozhko could *only* have gained access to IMS Health's material nonpublic earnings information through unlawful means.

On Wednesday, October 17, 2007, IMS Health's stock closed at $29.56 per share and the trading volume was 832,500 shares.  After IMS Health's negative earnings announcement, on October 18, IMS Health's stock price fell to a low of $21.20 per share, 28% lower than the previous day's closing price.  This was the steepest decline in the stock's trading history.  IMS

Health's stock closed at $23.12 per share that day, a decline of approximately 22% from the previous day's closing price. The trading volume on October 18 was more than 23 million shares, representing a more than 2,735% increase in trading from the previous day. Clearly, when Defendant Dorozhko purchased put options (to sell IMS Health common stock), the investing public was not aware of the negative news about IMS Health's third quarter earnings. The market reaction, represented by the steep drop in the price of its stock and dramatic increase in trading volume on October 18, indicates that investors believed that information about IMS Health's third quarter earnings was material.

Under the facts of this case, there is every reason to believe that the SEC will succeed on the merits, and thus a preliminary injunction is appropriate. Courts have imposed liability for insider trading even in the absence of an ability of the SEC to prove who the tipper was or how the tippee obtained the information. See, e.g., Sec v. Euro Sec. Fund, 2000 U.S. Dist. LEXIS 13847, at *7 (S.D.N.Y. 2000) (Defendant not entitled to summary judgment despite the SEC's inability to provide evidence of a tipper). Furthermore, if the SEC is ultimately able to establish that Defendant Dorozhko obtained the material nonpublic information directly through such unlawful means as computer hacking, such conduct is within the scope of Section 10(b) of the Exchange Act and Rule 10b-5. The term "hack," applied in this context, had been defined as "to explore and manipulate the workings of a computer or other technological device or system, either for the purpose of understanding how it works or to gain unauthorized access." Physicians Interactive v. Lathian Sys., Inc., 2003 U.S. Dist. LEXIS 22868, at *2-3 (E.D.Va. Dec. 5, 2003) (quoting Microsoft Encarta College Dictionary, 644 (1st ed. 2001) (granting a TRO and preliminary injunction for conduct alleged to be in violation of 18 U.S.C. § 1030 because the defendant hacked into a restricted website and used a computer software program (referred to in the case as an

"electronic robot") that systematically and rapidly stole and retrieved confidential information).

While it appears that no court has squarely addressed the question of whether gaining such

unlawful access to an issuer's material nonpublic information for the sole purpose of executing

favorable securities transactions based on that information constitutes a violation of Section

10(b) of the Exchange Act and Rule 10b-5, such conduct falls squarely within the scope of

conduct prohibited by the plain language of these provisions.  See.e.g, Second Gumagay Decl. ¶

10 and Ex. I.

It is well established that Section 10(b) was "intended to be broad in scope,

encompassing all 'manipulative and deceptive practices which have been demonstrated to fulfill

no useful function.'"  SEC v. Materia, 745 F.2d 197, 201 (2d Cir. 1984) (citing S. Rep No. 792,

73d Cong., 2d Sess., 6 (1934)).  The Supreme Court has also taken note that "the animating

purpose of the Exchange Act [is] to insure honest securities markets and thereby promote

investor confidence."  United States v. O'Hagan, 521 U.S. 642, 658 (1997).  A market in which

persons could freely trade on information fraudulently obtained through deceit, thievery or other

unlawful means, would surely be one in which "investors would hesitate to venture their capital."

Id.  Furthermore, it has suggested that Section 10(b) reaches trading based on information that

was "illegally obtain[ed]."  Dirks v. SEC, 463 U.S. 646, 665 (1983).  That position was

previously discussed at length in the dissenting opinions of Chief Justice Burger and Justices

Blackmun and Marshall in their dissenting opinions in Chiarella v. United States, 445 U.S. 222

(1980).  An expansive view of the scope of conduct subsumed by the broad prohibitions of

Section 10(b) is also consistent with the approach taken by this Circuit.  See, United States v.

Falcone, 257 F.3d 226 (2d Cir. 2001).  As discussed Zandford, a claim under Section 10(b) of the

Exchange Act involving use of confidential information requires two elements --- that there was

a fraudulent/deceptive device used "in connection with" a securities transaction.  In the case at

bar, the fraudulent/deceptive device is the theft or stealing of IMS Health's confidential material

information and the "in connection with" component is met by the Defendant Dorozhko's use of

the information for trading purposes.  See Zandford, 535 U.S. at 824 (citing O'Hagan, 521 U.S.

642, at 655-56).

      C.     Risk of Future Violations

      A preliminary injunction is appropriate in this case because there is a strong likelihood of

future violations.  As indicated in Defendant Dorozhko's brokerage account opening documents,

he claims that he has been actively trading stock and options for the last two years.  See, e.g.,

Shapiro, 494 F.2d at 1308 (injunction appropriate where defendant was not an incidental or

occasional investor).  He has also contacted Interactive Brokers to gain access to his frozen funds

for trading purposes.  His refusal to respond to repeated discovery requests from the SEC in

connection with this Court's Order, and his later assertion of his Fifth Amendment privilege

against self-incrimination as to all discovery requests and this Court's Order, undermines the

SEC's ability to develop further evidence of the nature and scope of his fraudulent trading.  But

perhaps most disturbing is Defendant Dorozhko's claims in his Motion to Dismiss that (1) he is

beyond the jurisdiction of the United States laws; and (2) stealing and exploiting stolen

confidential corporate information for purposes of garnering illegitimate profits through

securities trading is beyond the reach of the federal securities laws.  Having made such an

argument, it is reasonable to infer that he intends to continue to violate the federal securities

laws.

**VI.    An Order Continuing The Existing Asset Freeze Is Appropriate**

      Courts have frequently granted asset freezes in cases involving illegal trading where there

was a concern that the defendant might dissipate assets or transfer assets beyond the jurisdiction of the United States.  See, e.g., SEC v. Kan King Wong and Charlotte Ka On Wong Leung, 07 Civ. 3628 (S.D.N.Y. May 8, 2007) ($23 million asset freeze); SEC v. Sonja Anticevic, 05 Civ. 6991 (S.D.N.Y. Aug. 5, 2005) (court freezes $2 million in assets from timely call option trading by Croatian resident); SEC v. One or More Unknown Purchasers of Call Options and Common Stock of USCS Int'l, Inc., 98 Civ. 6327 (S.D.N.Y. Sept. 8, 1998) (asset freeze).  When there are concerns that defendants might dissipate assets, or transfer or secrete assets beyond the jurisdiction of the United States, courts in the Second Circuit need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze order.  See Unifund SAL, 910 F.2d at 1041 (where "[t]here is a basis to infer that the … [defendants] traded on inside information, and while the Commission is endeavoring to prove at trial the requisite element of trading in breach of a fiduciary duty of which the defendants were or should have been aware, the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged.").  In fact, in Unifund SAL, the Court upheld an asset freeze order notwithstanding the fact that it found the evidence insufficient to uphold the entry of a preliminary injunction.  See  Id.

In this case, there is a well-founded basis for concluding that Defendant Dorozhko may attempt to remove assets beyond the jurisdiction of this Court.  Since Mr. Dorozhko appears to reside overseas and the trading funds originated from an overseas account, it is reasonable to infer that Dorozhko would move his assets beyond the reach of this Court, absent this Court's Order.  Indeed, he has already attempted to access illicit trading proceeds held in his account at Interactive Brokers.  Such movement of assets would likely make it extremely difficult for the SEC to secure meaningful compliance with any appropriate relief the Court grants in this proceeding.

Defendant Dorozhko, through his recalcitrance in the expedited discovery process, has failed to account for all funds involved in the transactions set forth in the Complaint. To date, only a fraction of the monetary relief this Court could grant is frozen, i.e., the funds that are the result of the illegal trading ($286,456.59) and maintained at Interactive Brokers' Citibank account. Under the Insider Trading Sanctions Act, the Commission is entitled to seek not only disgorgement of the $286,456.59 in proceeds from Defendant Dorozhko's unlawful trading, but also all appropriate penalties (up to three times the profit) and prejudgment interest. Thus, at present, only approximately 28% of Defendant Dorozhko's potential liability is secured at Interactive Brokers' Citibank account. As noted above, this Court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze order. Id. Based on the facts presented, this Court should find that the relief requested by the SEC is appropriate. See, e.g., CFTC v. Rodriguez, 2006 US Dist. Lexis 13773 (S.D.N.Y. 2006) (asset freeze and other relief).

**VII.    Defendant Dorozhko Failed To Comply With The Expedited Discovery Order**

The Court Order provides for expedited discovery.  In this regard, Defendant Dorozhko is legally obligated to do, among other things, the following:

- Within five business days of the Court Order, Defendant Dorozhko was required to "[t]ake such steps as are necessary to repatriate to the territory of the United States all funds and assets that previously have been transferred overseas from his accounts in the United States that are held by or for him or are under his direct or indirect control, jointly or singly, and to deposit such funds into the Registry of this Court." I.D.(1) of Court Order.

- Within five business days of the Court Order, Defendant Dorozhko was required to "[p]rovide the SEC and the Court with a written statement, under oath, accounting for all funds used to pay for every transaction alleged in the Complaint and for all proceeds from each such transaction." I.D.(2) of Court Order.

- Within five business days of the Court Order, Defendant Dorozhko was required to "[p]rovide the SEC and the Court with a written statement, under oath, listing all names by which Defendant has been known, and all business and residential addresses, phone numbers, internet service providers, phone services, banks, brokers, financial services and account names for each, that either Defendant has used or in which Defendant has any reason to believe either Defendant has had, may have or could, in the future, have any direct or indirect beneficial interest at any time since January 1, 2005."

- Appear for a deposition upon oral examination, pursuant to Rule 30 of the Federal Rules of Civil Procedure, upon two days of e-mailed, telefaxed, or express couriered notice of any such deposition.  IV.A. of Court Order.

- Answer all interrogatories propounded by the SEC in writing and under oath, pursuant to Rule 33 of the Federal Rules of Civil Procedure, within two days of e-mailed, telefaxed, or express couriered service of such interrogatories.  IV.B. of Court Order.

- Produce all documents requested by the SEC, pursuant to Rule 34 of the Federal Rules of Civil Procedure, within two days of e-mailed, telefaxed, or express couriered service of such request.  IV.C. of Court Order.

- Answer all of the SEC's requests for admissions, pursuant to Rule 36 of the Federal Rules of Civil Procedure, within two days of e-mailed, telefaxed, or express couriered service of such requests.  IV.D. of Court Order.

To date, despite repeated requests from the SEC, Defendant Dorozhko has failed to comply with this Court's Order with respect to each of the above obligations.  (Second Gumagay Decl. ¶¶ 8-9 and Exs. G-H).

In addition to failing to comply with the mandated aspects of this Court's Order, Dorozhko has also failed to comply with those obligations triggered by a discovery request.  On November 5, 2007, the SEC served a notice of deposition and document request on Defendant Dorozhko and his counsel with a return date of November 8, 2007.  (Second Gumagay Decl. ¶ 3 and Ex. B).  On November 6, 2007, the SEC also served Requests for Admissions and Interrogatories on Defendant Dorozhko's counsel with a return date of November 9, 2007.

(Second Gumagay Decl. ¶¶ 4-5 and Exs. C-D).  Defendant Dorozhko has not sought relief from these SEC's discovery requests.

Defendant Dorozhko's deposition was scheduled for Thursday, November 8, 2007, at 10:00 a.m. The requested documents were required to be produced at the time of his deposition.  However, Defendant Dorozhko failed to appear for his scheduled deposition or produce any document at the required time.  Hours after he failed to appear for his scheduled deposition, Defendant Dorozhko's counsel notified the SEC that Defendant Dorozhko "invokes his Fifth Amendment Right Against Self Incrimination" against (1) paragraphs I.B.2. (asset identification), I.D.1. (repatriation of assets), I.D.2. (accounting), and I.D.3. (list of names) of the Court Order; (2) interrogatories, requests for information or other statement sought from him; and (3) the Notice of Deposition and Request for Production of Documents.  (Second Gumagay Decl. ¶ 7 and Ex. F).  The SEC is entitled to an adverse inference against Defendant Dorozhko because his invocation of the Fifth Amendment privilege disadvantages the SEC by preventing the SEC from obtaining information that the SEC is otherwise entitled to.  See e.g., Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) ("Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them…"; SEC v. Hirshberg et al., 1999 U.S. App. LEXIS 4764, at *4 (2d Cir. 1999) ("litigants denied discovery based upon an assertion of the [Fifth Amendment] privilege may ask the court or trier of fact to draw a negative inference from the invocation of the right") (citations omitted); SEC v. North Shore Asset Management et al., 2006 U.S. Dist. LEXIS 39255, at *7 (S.D.N.Y. 2006) (Court properly drew adverse inference from defendant's failure to testify) (citations omitted); SEC v. Invest Better 2001, 2005 U.S. Dist. LEXIS 34654, at *4 (S.D.N.Y. 2005) ("reliance on the Fifth Amendment in civil cases may give rise to an adverse inference against

the party claiming its benefits…[t]his is because invocation of the privilege *necessarily results in a disadvantage to opposing parties by 'keeping them from obtaining information they could otherwise get*.'" (emphasis added) (internal citations omitted).  As a result of Defendant Dorozhko's assertion of his Fifth Amendment privilege, the SEC has been deprived of the opportunity to, among other things, (1) learn the true scope of Defendant Dorozhko's fraud and degree of scienter; (2) trace all of Defendant Dorozhko's ill-gotten gains; (3) determine the complete scope of Defendant Dorozhko's assets; (4) collect evidence from Defendant Dorozhko to support the SEC's application for a preliminary injunction, continuation of the asset freeze, and other relief; and (5) learn Defendant Dorozhko's potential defenses, if any.

## VIII.   Conclusion

For the reasons set forth above, the SEC respectfully requests that this Court grant its application for a preliminary injunction and an order extending the freeze on Defendant Dorozhko's assets for the duration of this litigation and granting the other relief discussed above and set forth in the SEC's proposed Order.  In addition, Defendant Dorozhko's Motion to Dismiss should be denied.

Dated:  _____                          Respectfully submitted,
                                                 _____S/_____
_____                         Carl A. Tibbetts (Trial Counsel)
Robert B. Blackburn (RB 1545)                    Christopher R. Conte
Local Counsel                                    Charles E. Cain
U.S. Securities and Exchange Commission          Christine E. Neal
3 World Financial Center, Room 4300              Paul A. Gumagay (PG0805)
New York, New York 10281-1022                    Suzanne E. Ashley
(212) 336-1050                                   Attorneys for Plaintiff
(212) 336-1317 (Fax)                             U.S. Securities and Exchange Commission
                                                 100 F Street, N.E.
                                                 Washington, DC 20549-4030
                                                 (202) 551-4483 (Tibbetts)
                                                 (202) 551-4443 (Gumagay)
                                                 (202) 772-9233 (Fax)

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing (1) Plaintiff Securities And Exchange

Commission's Memorandum Of Law In Reply to Defendant Dorozhko's Opposition to

Plaintiff's Motion for Preliminary Injunction and Other Equitable Relief and Opposition to

Defendant's Motion to Dismiss with Attached Exhibits; (2) Second Declaration Of Paul A.

Gumagay; (3) Declaration Of Stephen Glascoe; (4) Declaration of Michael Fox; and (5)

Declaration of Martin Ward; via e-mail, facsimile, and Federal Express for overnight delivery, as

indicated below, on November 9 2007 to the following persons at the addresses set forth below:

Charles A. Ross, Esq.
Charles A. Ross & Associates
111 Broadway
Suite 1401
New York, NY 10006
***Via Federal Express***
***& E-mail at*** [cross@carossassoc.com](mailto:cross@carossassoc.com)
***& Facsimile (212) 616-3033***
*Counsel to Defendant Dorozhko*

_____S/_____
Christine Neal