UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
                                                                         :
SECURITIES AND EXCHANGE COMMISSION,                                      :
                                                                         :
                              *Plaintiff,*           :     No. 07 CV 9606
                                                                         :
                v.                                            :     Judge Naomi R. Buchwald
                                                                         :
OLEKSANDR DOROZHKO,                                                      :
                                                                         :
                             *Defendant.*          :
------------------------------------------------------------------------ x

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
OLEKSANDR DOROZHKO'S MOTION TO DISMISS THE COMPLAINT
AND TO VACATE THE TEMPORARY RESTRAINING ORDER,
<u>AN ORDER FREEZING ASSETS AND GRANTING OTHER RELIEF</u>**

CHARLES A. ROSS & ASSOCIATES, LLC
Charles A. Ross (CR-1331)
Christopher L. Padurano (CP-2587)
Trinity Centre
111 Broadway, Suite 1401
New York, New York 10006
(212) 616-3030

Attorneys for Defendant Oleksandr Dorozhko

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT ...................................................................................................... 2

    I.    THE COMMISSION HAS NOT DEMONSTRATED THAT THE CONDUCT ALLEGED IN THE COMPLAINT AMOUNTS TO A DECEPTIVE DEVICE ................................................................ 2

    II.    THE COURT SHOULD VACATE THE TEMPORARY RESTRAINING ORDER AND LIFT THE ASSET FREEZE ............... 3

        A.    The Commission Is Not Entitled to a Preliminary Injunction ........ 3

        B.    The Trades at Issue Could Just as Likely Have Been Consummated Based on a Highly Effective Trading Strategy ...... 5

    III.   Procedural History ............................................................................. 8

    IV.   Conclusion ......................................................................................... 10

- ii -

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Conn. Nat'l Bank v. Germain*
    503 U.S. 249 (1992) .......................................................................................... 4

*Physicians Interactive v. Lathian Sys., Inc.*,
    2003 WL 23018270 (E.D.Va. Dec. 5, 2003) ..................................................... 4

*SEC v. Euro Sec. Fund*,
    2000 WL 1376246 (S.D.N.Y. Sept. 25, 2000) ................................................ 3-4

## FEDERAL STATUTES

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ......................................................... 4

## MISCELLANEOUS

Kenneth Glazer, *The IMS Health Case: A U.S. Perspective*,
    13 Geo. Mason L. Rev. 1197 (2006) ............................................................... 7

Catherine Arnst, "IMS Health: Where the Best Medicine Is Data,"
    *Business Week,* June 25, 2007 ......................................................................... 6

**PRELIMINARY STATEMENT**

The Securities and Exchange Commission's ("SEC" or "Commission") reply to Oleksandr Dorozhko's ("Dorozhko") Motion to Dismiss and request for related relief ("Motion to Dismiss") provides an inordinate amount of case law, declarations, and exhibits in support of its position that Dorozhko traded on the basis of material nonpublic information he gained through fraudulent conduct. This purported fraudulent conduct, according to the Commission, either took the form of hacking into a computer system or obtaining a tip from someone else in breach of a duty of trust and confidence or trading in direct violation of a duty of trust and confidence Dorozhko owed to the purported source of the information. *See* Plaintiff Securities and Exchange Commission's Reply Memorandum of Law and Opposition to Dorozhko's Motion to Dismiss ("Reply Memorandum") at 9-10. However, the Commission continues to provide not a single fact to support the claim that Mr. Dorozhko accessed material nonpublic information.

Moreover, the Commission itself writes that

> "it appears that no court has squarely addressed the question of whether gaining such unlawful access to an issuer's material nonpublic information for the sole purpose of executing favorable securities transaction based on that information constitutes a violation of Section 10(b) of the Exchange Act and Rule 10b-5 ..."
> *Id.* at 19.

The Commission states that such alleged conduct must be a violation of the securities laws of this country because the Commission says so and because "such conduct falls squarely within the scope of conduct prohibited by the plain language of Section 10(b) and Rule 10b-5. *Id.* However, the Commission lacks the authority under Rule 10b-5 to pursue a case on a theft of material nonpublic information where there neither a breach of a duty to the source of the allegedly stolen information, nor any credible allegation of conduct that could reasonably be construed as deceptive.

1

Finally, the trades at issue in this case are not as risky as the Commission indicates. *See e.g.,* Declaration of Stephen P. Glascoe Submitted in Support of the Reply Memorandum ("Glascoe Decl."). While the Commission in unwavering in its position that the trades were unlawful, it is entirely plausible, on the other hand, the trades could just as likely have been made based on a reasonable and effective trading strategy.

## ARGUMENT

### I.  THE COMMISSION HAS NOT DEMONSTRATED THAT THE CONDUCT ALLEGED IN THE COMPLAINT AMOUNTS TO A DECEPTIVE DEVICE

The Complaint ("Compl.") nakedly alleges that Mr. Dorozhko engaged in fraudulent conduct through computer hacking or some other "fraudulent device, scheme, or artifice." *See* Compl. ¶ 3. The Commission, in its Reply Memorandum, now attempts to amplify this allegation and claims that Dorozhko engaged in fraudulent conduct through "hacking, or more traditional methods" such as receiving a tip. *See* Reply Memorandum at 10. However, what is interesting is that while the Complaint focuses on "hacking into computer networks," the Commission's Reply Memorandum now adds a supposed "traditional method" of obtaining material nonpublic information in violation of the securities laws. In short, the Commission has no idea how or even whether material nonpublic information was accessed. It continues to fail to provide a single, solitary fact to support its claim and instead relies solely upon rank speculation.

While the Commission submitted various declarations in support of its request for a Temporary Restraining Order ("TRO") and in support of its Reply Memorandum, what is glaringly absent from these declarations is any concrete allegation that Dorozhko either hacked into a computer system or otherwise received a tip from someone. Indeed, the Declaration of Martin John Ward, Compliance Counsel in the Chicago office of Interactive Brokers LLC

2

("Interactive Brokers") states that "[o]n October 19, 2007, Interactive Brokers began an internal investigation of Dorozhko's trades in the put options of [IMS Health Incorporated] and placed restrictions on the account preventing the withdrawal of funds and restricting trading." (Ward Decl. ¶ 14). Nowhere does Mr. Ward say what the results of that "internal investigation" were. We just do not know what, if anything was uncovered, and to order a preliminary injunction on this lack of concrete evidence is unwarranted.

In short, the Commission is simply not empowered to police thefts of confidential information of the type alleged here, regardless of how superficially attractive those allegations may appear to be. Certainly, here there are no specific allegations of wrongdoing even to police – merely bare speculation.

## II. THE COURT SHOULD VACATE THE TEMPORARY RESTRAINING ORDER AND LIFT THE ASSET FREEZE

### A. The Commission Is Not Entitled to a Preliminary Injunction

The Commission, in arguing that it is likely to succeed on the merits, and thus is entitled to a preliminary injunction, reiterates a substantial portion of its Memorandum of Law in support of its emergency application for a TRO, and makes the leap that "Dorozhko could *only* have gained access to IMS Health's material nonpublic earnings information through unlawful means." *See* Reply Memorandum at 17. In support of its proposition that Dorozhko purportedly obtained nonpublic earnings information, the Commission first cites a tipper/tippee case, *SEC v. Euro Sec. Fund,* 2000 WL 1376246 (S.D.N.Y. 2000). *See* Reply Memorandum at 18. There, the Commission charged the defendant with a violation of "Section 14(e) of the Williams Act, and Rule 14e-3, which prohibits trading on the basis of material nonpublic information concerning a pending tender offer that he knows or has reason to know has been acquired 'directly or indirectly' from an insider of the offeror or issuer, or someone working on their behalf." *Id.* at 3.

3

The Commission's reliance on *Euro Sec. Fund* is misplaced for several reasons. First, this instant matter involves purported allegations of Section 10(b) of the Exchange Act and Rule 10b-5, not Section 14(e) of the Williams Act, and Rule 14e-3. Second, in *Euro Sec. Fund*, the Commission presented documentary evidence connecting one of the defendants to an insider. Here, there is absolutely no evidence – circumstantial or otherwise – linking Dorozhko to an insider.

The Commission then offers for the Court's consideration *Physicians Interactive v. Lathian Sys., Inc.*, 2003 WL 23018270 (E.D.Va. 2003), for the definition of "hack." *See* Reply Memorandum at 18. In *Physicians Interactive*, the plaintiff was suing the defendants for, *inter alia,* a "private right of action under the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030." *Id.* at *3. While the Computer Fraud and Abuse Act ("CFAA") created powerful tools designed to provide the United States Department of Justice with the means to combat computer crimes, there is no textual basis to assume, as the Commission seems to believe, that Congress intended the CFAA to bestow any additional authority on the Commission, or in any way modify the definition of "manipulative or deceptive practice" in Section 10(b). *See Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992) (observing that courts must presume that a legislature says in a statute what it means and means in a statute what it says).

Consequently, there is not "every reason to believe that the SEC will succeed on the merits." *See* Reply Memorandum at 18. The Commission's attempt to patch together a fraud scheme from what started out as an alleged "computer hacking" case and has now morphed into a "computer hacking" or "tipper/tippee" case should give the Court sufficient pause as to the Commission's ability to prevail on the merits. The Commission presents no facts to support its claim of fraud based upon the use of nonpublic material information. Moreover, in the absence

of a duty, the Commission simply has no power to pursue this type of violation, even if it existed.

Regarding the second prong the SEC must meet in order to obtain injunctive relief – a "reasonable likelihood" of future violations absent the injunction – we rely on the argument in our previously filed Motion to Dismiss, namely, that the Commission alleges essentially a single trade and not a pattern or trades. *See* Part II.A.3.

### B.   The Trades at Issue Could Just as Likely Have Been Consummated Based on a Highly Effective Trading Strategy

While the Commission claims time and time again that circumstantial evidence indicates the trades executed by Dorozhko were somehow based on a fraud, the fact of the matter is that the trades could just as likely have been consummated by means of an effective trading strategy. Materials available in the public domain clearly indicate that IMS Health intended to announce third-quarter results on October 17, 2007. *See* Exhibit 1. Thus, the third-quarter announcement would demonstrate that IMS Health's earnings would either (a) come in under the markets' earnings expectations, (b) exceed the expectations, or (c) just meet them. Obviously, an earnings announcement is likely to have an effect on stock price. An enterprising trader could essentially place a "bet" timed just before an earnings announcement on how the market might react to the publicly planned release. Here, it is just as likely the trades in question were a "bet" that after the anticipated earnings announcements the price of IMS Health's stock would drop. This was consistent with other materials easily available in the public domain. Indeed, two separate analysts downgraded IMS Health's stock in May 2007. *See* Exhibit 2.

Further, although the Commission claims that the only possible explanation for Dorozhko's profitable trades in IMS put options was fraud, this unfounded belief rests in large measure on the assumption that there were no publicly available signs that the company was in

5

trouble prior to its October 17 earnings release. This might appear to be true if a trader were relying solely on the stock analysts who were authorized to ask questions during IMS's quarterly earnings conference calls, and who are listed by IMS on the Investor Center section of its website. *See* Exhibit 3. Indeed, one of these IMS-approved analysts, Eric Coldwell of Robert W. Baird & Co., had even gone so far as to tell *Business Week*, less than four months before the company's stock tanked: "I am incredibly confident in this company and this management . . . . My only concern is that I have no concerns." *See* Exhibit 4.

As it turns out, Mr. Coldwell would have done well to follow up on his concern about having no concerns. Had he dug deeper – as any enterprising trader could – and sought out information from the street rather than Street.com, he might have discovered that things were not nearly so rosy.

Less than three weeks before the IMS earnings announcement, there was heated debate on the pharmaceutical internet discussion boards Cafepharma and Pharmalot that IMS data was "wreaking havoc" with Novartis, a global pharmaceuticals company, which had relied on IMS to calculate market share and sales representative compensation. Indeed, Novartis, obviously a major IMS client, had taken the extraordinary step of asking its own pharmaceutical sales representatives to return bonus money they had already been given. In an October 1, 2007 posting, Pharmalot reported that a Novartis spokesperson in Switzerland had written that "IMS is to blame for this situation." An insider at Novartis posted the news that Novartis had scheduled a conference call on October 9 to discuss the reporting error. Later that day, an IMS spokesperson sent Pharmalot a statement saying that the company "does not comment publicly on client matters." Pharmalot concluded from this response that IMS did not deny having caused the problem. This situation, which struck at the very heart of the service IMS supplied to major

clients, later affected pharmaceutical giants Merck, Wyeth, and Lilly – all important IMS clients. Indeed, on Cafepharma, which is a discussion board for pharma-reps, there was a discussion in the first week of October 2007 with many negative comments about IMS. *See* Exhibit 5.

This information was available to anyone with an internet connection. Any thorough non-risk-averse trader could have used creativity in looking beyond the establishment analysts and put his ear to the ground to hear the rumblings of discontent among major IMS clients whose businesses and bottom lines were directly affected by the IMS failures in this area. Indeed, IMS itself was accused of wrongdoing in a 2001 antitrust action brought by the European Commission over its proprietary format for supplying data to pharmaceutical companies. In an article in George Mason Law Review, Kenneth Glazer, Deputy Director of the Bureau of Competition at the Federal Trade Commission, took issue with the Commission's finding that IMS had abused its dominance in the German market. *See* Exhibit 6. He posits that IMS had not "done anything particularly creative" in developing the data gathering system that became the de facto industry standard, but that it was the "first mover and locked its customers into" this system. Its monopoly was the result of IMS having had the foresight to copyright its format, not "malign behavior." "After all," Glazer concludes, "being in the right place at the right time is not always a matter of dumb luck." *Id.* at 1215.

Here, it is very likely Mr. Dorozhko was "in the right place at the right time" because he effectively researched IMS, realized the third-quarter announcement could very well have been negative, and made a bet in advance of the earnings release on a date and at a time that was publicly known. Certainly this scenario presents more objectively verifiable facts than the Commission's rank speculation that Mr. Dorozhko was tipped or computer hacked his way into possession of material nonpublic information.

7

### III.  Procedural History

Commission raises a question regarding the propriety of Mr. Dorozhko's motion to dismiss. The motion was submitted as one brought on by the order to show cause. As an initial matter, regarding the filing of our Motion to Dismiss and request for other relief, while there was no intent to "disregard [] this Court's Individual Practices" as alleged by the Commission, *see* Reply Memo at p. 6, we respectfully request that the Court view our submission as a response to the Commission's request for a preliminary injunction or as a "motion to be brought on by orders to show cause."[1]

As to the Commission's presumed reliance on obtaining a brief adjournment in this matter, *see* Reply Memo at p.6, counsel for Dorozhko repeatedly explained to the Commission from on or about October 29, 2007, through November 5, 2007, that it was not yet officially retained in this matter. Indeed, SEC counsel confirms this in an electronic mail ("e-mail") dated November 2, 2007, in which it writes that "[w]e have been informed by [Charles Ross], Esquire, of Charles A. [R]oss and Associates that at this time he only represents you with respect to your dealings with Interactive Brokers and acceptance of service of process for you."[2]

On Tuesday, November 6, 2007, counsel for Dorozhko spoke to the Commission at approximately 11:15 a.m., via telephone, and advised it that Dorozhko officially retained them and that counsel was prepared to file a Notice of Appearance ("Notice"). The Commission asked that the filing of the Notice be done sooner, rather than later, and the Notice was filed at approximately 11:24 a.m. *See* Exhibit 7. During this same conversation on the morning of

---

[1] *See* Individual Practices of Naomi Reice Buchwald, United States District Judge, Rule 2.A (November 2006), available at http://www1.nysd.uscourts.gov/cases/show.php?db=judge_info&id=120.

[2] Rather than burden the Court with duplicate exhibits, we respectfully point the Court to Exhibit G of Paul Gumagay's Declaration (Second) in Support of the Commission's Reply Memorandum to see a copy of this e-mail.

8

November 6, 2007, counsel for Dorozhko informed the Commission that Dorozhko would invoke his Fifth Amendment Right Against Self-Incrimination to certain required responses.[3] Notably, even before this conversation, counsel for Dorozhko informed the Commission that an adjournment of the matter would be unnecessary since it would be able to file a response to the Commission's Complaint by the end of the day.[4] Accordingly, any miscommunication between the Commission and Dorozhko's counsel is likely attributable to the fact that counsel was not fully retained in this matter until the morning of November 6, 2007, and was faced with a Complaint to which it had to respond. Thus, the Commission was never misled or inconvenienced.

---

[3] Although this invocation on behalf of Dorozhko was done orally, counsel for Dorozhko confirmed the invocation in writing via a letter to the Commission on November 8, 2007. Rather than burden the Court with duplicate exhibits, we respectfully point the Court to Exhibit F of Paul Gumagay's Declaration (Second) in Support of the Commission's Reply Memorandum to see a copy of this letter.

[4] Additionally, in an e-mail dated November 6, 2007, counsel for Dorozhko informed SEC counsel that it intended to file its papers by the end of the day (pursuant to the Court's October 29, 2007 Order for a Temporary Restraining Order), and thus, "an adjournment will be unnecessary." *See* Exhibit 8.

## **CONCLUSION**

For the foregoing reasons and the reasons set forth in our initial submission, the Complaint should be dismissed with prejudice, and the Temporary Restraining Order, An Order Freezing Assets and Granting Other Relief, the should be vacated.

Dated: New York, New York
      November 12, 2007

                                        Respectfully submitted,

                                        CHARLES A. ROSS & ASSOCIATES, LLC

                  By: _____

                                        Charles A. Ross (CR-1331)
                                        Christopher L. Padurano (CP-2587)
                                        Trinity Centre
                                        111 Broadway, Suite 1401
                                        New York, New York 10006
                                        (212) 616-3030

                                        Attorneys for Defendant Oleksandr Dorozhko


TO:    Carl A. Tibbetts
          Assistant Chief Litigation Counsel
          U.S. Securities and Exchange Commission
          100 F Street, N.W.
          Washington, D.C. 20549-4030

          Robert B. Blackburn
          Local Counsel
          U.S. Securities and Exchange Commission
          3 World Financial Center, Room 4300
          New York, New York 10281-1022

## CERTIFICATE OF SERVICE

I certify that on November 12, 2007, I caused a copy of the Memorandum of Law in Further Support of Oleksandr Dorozhko's Motion to Dismiss the Complaint and to Vacate the Temporary Restraining Order, An Order Freezing Assets and Granting Other Relief, to be served via the Electronic Court Filing system and by electronic mail on:

> Carl A. Tibbetts
> Assistant Chief Litigation Counsel
> U.S. Securities and Exchange Commission
> 100 F Street, N.W.
> Washington, D.C. 20549-4030
>
> Robert B. Blackburn
> Local Counsel
> U.S. Securities and Exchange Commission
> 3 World Financial Center, Room 4300
> New York, New York 10281-1022

_____
Charles A. Ross