# EXHIBIT 6

7/11/2006 9:22:44 PM

# THE *IMS HEALTH* CASE: A U.S. PERSPECTIVE

*Kenneth Glazer*[*]

*I can resist anything . . . except temptation.*[1]

## INTRODUCTION

The European Commission's *IMS Health* case, one of the more controversial antitrust cases in recent years, concerned an appealing target for intervention by an antitrust authority.[2] For many years IMS Health was the sole supplier of regional sales data to the pharmaceutical industry in Germany. At issue in the case was the particular format in which IMS supplied the data to its pharmaceutical customers—a format based on geographical units, known as "bricks" that consist of one or more postal codes.

On first glance, the case for intervention seems compelling. The IMS brick system, developed with extensive collaboration and input from the drug companies, had become the industry standard, and the drug companies organized their sales territories and marketing programs around it. Changing to a different format would have been extremely burdensome and expensive for the drug companies, and, evidently, no one could compete against IMS without using some variation of this system. IMS made that option unavailable by refusing to license its copyright in the "brick" system. And IMS's copyright claim itself seemed questionable.

In 2001, the Commission issued a preliminary ruling finding that IMS had abused its dominance in the German market and requiring it to license the brick system to two competitors, NDC and AzyX. The Commission, in other words, acceded to the temptation to intervene: here was a clear absence of competition that could be fixed with a simple and clean order.

In so ruling, the Commission acted incorrectly. Antitrust law is and ought to be skeptical of claims that a firm should be forced to deal with a

---

[*] I am grateful to Stephen Harris, Alan Silverstein, Ronald Stern, Alden Abbott, Suzanne Michel, and several anonymous reviewers for helpful comments and suggestions on drafts of this article. The views expressed in this article are the author's own. They do not necessarily represent the views of the Federal Trade Commission or any other individual Commissioner.

[1] OSCAR WILDE, LADY WINDERMERE'S FAN.

[2] Commission Decision 2001/165, 2002 O.J. (L59) 18 [hereinafter "Main Commission Decision"]. Related decisions will be cited as they are discussed.

7/11/2006 9:22:44 PM

rival. To put it plainly, competition depends on competitors competing. Antitrust law on both sides of the Atlantic recognizes that forced cooperation with rivals should be imposed only in the most exceptional circumstances, and the IMS case presented no such circumstances. IMS had a valid copyright, which inherently gave it the ability to refuse to license. If the copyright was questionable, that could (and should) have been handled by the copyright system directly. Granting a copyright and then effectively taking it away in an antitrust proceeding is not the right way to address flaws in the copyright system. The *IMS* case is a useful prism through which to analyze these issues.

I.  *IMS HEALTH*

A.  *Background*

Intercontinental Marketing Services Health Inc. ("IMS"), a U.S. company, is the leading worldwide supplier of information to the pharmaceutical and healthcare industries.[3] IMS can be viewed as the Nielsen of the pharmaceutical business: it gathers and organizes data on pharmaceutical sales and repackages that data for sale to the pharmaceutical companies. The data comes from wholesalers of drugs based on sales to retailers.[4]

IMS operates in many countries but this case concerns only Germany. For many years IMS was the sole player in the German pharmaceutical-data business. Then, starting in 1999, two other companies—the National Data Corporation ("NDC"), another U.S. company, and AzyX, a Belgian company—tried to break into this market.[5] They ran into difficulties, though, due to IMS's "1860 brick" system.

A brick system is a way of organizing sales data on a regional basis, with a "brick" referring to a small geographical area consisting of at least four or five pharmacies. Pharmaceutical companies use brick-level data for various purposes including measuring the effectiveness of their salespeople and designing incentives schemes. Data service companies like IMS Health and NDC organize the data into "bricks." The pharmaceutical companies, in turn, organize their sales forces and incentive programs according to that brick structure. For example, a salesperson's territory may consist of several bricks and market shares are often tracked according to bricks.[6]

---

[3]  *Id.* at 18.

[4]  *Id.* at 20-21. There was no suggestion in the case that IMS's competitors were unable to obtain this data from the wholesalers for the same fee IMS paid.

[5]  *Id.* at 21.

[6]  *Id.*

The number "1860" refers to the number of bricks in the system developed by IMS after years of working with the pharmaceutical companies. Modifications to the system resulted from, among other things: (1) subdivisions of original segments, (2) changes in the German administrative system, and (3) the inclusion of the former East Germany.[7] There was no requirement, legal or otherwise, that drug companies organize their businesses around the 1860 system; rather, it was a de facto industry standard adopted by the pharmaceutical companies "with very few exceptions."[8] It is unclear how much IMS actually invested in the development of the 1860 system. Apparently, IMS had never claimed a copyright in the 1860 system until rivals NDC and AzyX tried to enter the market.

At first, NDC and AzyX tried to work around the 1860 brick system, organizing their data in a different brick system, but the drug companies were unwilling to move to these new systems.[9] When NDC and AzyX started using the 1860 brick system, or close variations, IMS took them to court. In a series of actions against NDC and AzyX, IMS persuaded the Frankfurt District Court to issue an injunction against the use of the 1860 system and any system derived from it because they found IMS had a valid copyright in the 1860 brick system. All appeals were ultimately unsuccessful. IMS rejected NDC's and AzyX's requests for copyright licenses and threatened wholesalers and drug manufacturers that they too would be implicated in a copyright infringement suit if they purchased infringing services from IMS's competitors.[10]

Prodded by competitor complaints, the European Commission began an investigation into whether IMS's refusal to license the 1860 system to NDC and AzyX constituted an abuse of IMS's dominant position in the German data services market in violation of Article 82 of the Treaty of Rome.[11]

## B.    *The Commission's 2001 Decision*

In July 2001, the Commission issued a preliminary decision against IMS. After finding that IMS had a dominant position in the German data services market,[12] the Commission went on to consider whether IMS's re-

---

[7]    *Id.* at 21-22.

[8]    Main Commission Decision, *supra* note 2, at 21. There was no claim in the case of any agreement among drug companies to use that standard.

[9]    *See id.* at 35-39.

[10]    *Id.* at 22.

[11]    *Id.* at 19.

[12]    *Id.* at 24-25.

7/11/2006 9:22:44 PM

fusal to license its intellectual property rights (IPRs) constituted an abuse. It applied a three-part test derived from various Court of Justice decisions:[13]

(*) Refusal of access to the facility is likely to eliminate all competition in the relevant market;

(*) Such refusal is not capable of being objectively justified; and

(*) The facility itself is indispensable to carrying on business, inasmuch as there is no actual or potential substitute in existence for that facility.[14]

For the Commission, the key question was "whether there is a real possibility for customers of regional sales data of buying data formatted in another structure."[15] It answered this question in the negative, finding (1) that the drug companies played a major role in the development of the 1860 structure through an IMS-created "Working Group;" (2) that the 1860 structure became a de facto industry standard; and (3) that the drug companies had become dependent on it. Very few drug companies said they would accept a different brick structure. The vast majority said that they "would not change the current 1860 structure or they could not accept a new structure which would require them to modify their current sales territory."[16] According to the Commission, "[t]he pharmaceutical companies have become 'locked in' to this standard such that to switch away from it to buy sales data formatted in a non-compatible structure, whilst theoretically possible, would be a [sic] unviable economic proposition."[17]

This is so for several reasons, according to the Commission. First, the companies must be able to compare sales and market share data across time periods but cannot do that unless all their data is in the same format. Translating non-1860 data into the 1860 format would be difficult, and the companies "need older back data than [IMS's competitors] can provide" in their non-1860 formats.[18] Second, other data used by the drug companies regarding, e.g., demographics, purchasing power and doctors, is also in the 1860 format and they "could only consider switching structures [for the sales

---

13  *Id.* at 26-27. The Commission principally relied on *United Brands*, Case 27/76 United Brands v. Comm'n., 1978 E.C.R. 207; *Ladbroke*, Case T-504/93 Tierce Ladbroke SA v. Comm'n., 1977 E.C.R. II-923; *Magill*, Joined Cases C-241/91 P. Radio Telefis eireann (RTE) & Indep. Television Publ'ns Ltd. (ITP) v. Comm'n., 1995 E.C.R. I-0743; and *Bronner*, Case C-7/97 Oscar Bronner GmbH & Co. KG. v. Mediaprint Zeitungsund Zeitschriftenverlag GmbH & Co KG, 1998 E.C.R. 207. *Id.*

14  Main Commission Decision, *supra* note 2, at 26-27.

15  *Id.* at 27.

16  *Id.* at 29.

17  *Id.*

18  *Id.* at 30.

7/11/2006 9:22:44 PM

data] if these [sic] other data were also available in this new structure."[19]
Third, the 1860 structure is built into much of the software used by the drug
companies.[20] A change away from the 1860 format would require re-tooling
of software or investment in new software products at the expense of the
drug companies. Fourth, use of a different structure would require the com-
panies to re-align their sales territories, which in turn would disrupt the
valuable relationships between their sales representatives and doctors.[21]
Finally, realignment of salespeople would also require a change in the
working contracts between the company and the sales representative—a
major issue in Germany due to complex "work council" regulations.[22]

The Commission concluded that "the costs, competitive disadvantages
and other problems . . . which pharmaceutical companies would incur if
they were to switch from this structure to buy regional sales data formatted
in another structure would be unacceptably high . . . ."[23] That it was techni-
cally feasible for IMS's competitors to develop an alternative brick struc-
ture was, in the Commission's view, irrelevant because the 1860 structure
had become so standard in the industry that drug companies would not con-
sider using data organized in any other way.[24] The Commission recognized
that the essence of an IPR is the holder's right to prevent others from using
the subject of that right, but nevertheless found that there may be "excep-
tional circumstances" in which the refusal to grant a license may constitute
an abuse.[25] Such refusal constitutes abuse when there is no "objective justi-
fication" for the refusal.[26] Finding no objective justification for IMS's re-
fusal, the Commission concluded an abuse had occurred. IMS argued that,
"NDC offered only a nominal sum for a licence," but the Commission
found it clear that "IMS refused, in spite of repeated requests, even to dis-
cuss a licence."[27]

In response IMS also argued that the Commission could not find abuse
because "there is no second related market on which competition is re-
stricted." However, the Commission held that "the fact that the cases con-
sidered by the [European Court of Justice] ECJ and [Court of First In-

---

19  *Id.* at 31.

20  Main Commission Decision, *supra* note 2, at 31-32.

21  *Id.* at 32-33. The Commission explains, "[L]oss of relationships between doctors and sales
representatives which would be the inevitable result of a change to a brick structure which was incom-
patible with the 1860 brick structure would act as a [sic] important disincentive for certain pharmaceuti-
cal companies to make such a change." *Id.* at 33.

22  *Id.* at 33-34.

23  *Id.* at 34.

24  *Id.* at 35.

25  *Id.* at 40-41.

26  Main Commission Decision, *supra* note 2, at 41.

27  *Id.*

7/11/2006 9:22:44 PM

stance] CFI to which IMS refers involved two markets [*Magill, Ladbroke,* and *Bronner*] does not preclude the possibility that a refusal to licence an intellectual property right can be contrary to Article 82," and in any event, "there is an important distinction between the product, which is regional sales data services, and the brick structure in which data used to create these services is formatted."[28]

The Commission found it necessary to impose interim measures to prevent NDC and AzyX from exiting the German market[29] and required IMS to license the 1860 system to its competitors, subject to a license fee determined by independent experts if necessary.[30]

## C.   *Post-Decision Developments*

The interim relief order was suspended by the Court of First Instance, through its President, in October of 2001, pending a substantive ruling by that court.[31] Though not ruling one way or the other, the CFI found a "serious dispute" as to whether the Commission was correct in applying *Magill* to a situation in which the product being offered by the dominant firm's competitors was not actually "new" but "differing only as to detail" from the incumbent product.[32] The CFI explained its concern:

> The Commission's provisional conclusion that the prevention of the emergence of a new product or service for which there is potential consumer demand is not an indispensable part of the notion of exceptional circumstances developed by the Court of Justice in *Magill* constitutes, at first, an extensive interpretation of that notion. Accordingly, only the main judgment can remove the serious dispute concerning the correctness of this interpretation.[33]

Finding a "real and tangible risk" that the interim order could cause "serious and irreparable harm" to IMS,[34] the President went on to find no need for interim relief under a "balance of interests" analysis.

In April 2002, the President of the Court of Justice dismissed NDC's appeal from the CFI's ruling suspending the interim measures.[35] Then in August 2003, the Commission withdrew its interim order—which had al-

---

28   *Id.* at 42-43.

29   *Id.* at 43-45.

30   *Id.* at 46-48.

31   Case T-184/01 R, IMS Health Inc. v. Comm'n., 2001 E.C.R. II-3193 [hereinafter *CFI President's Decision*].

32   *Id.* ¶ 101.

33   *Id.* ¶ 102.

34   *Id.* ¶ 132.

35   Order of Apr. 11, 2002, Case C-481/01P(R), *available at* http://www.curia.eu.int/en/content/juris/index.htm.

7/11/2006 9:22:44 PM

ready been suspended—following a new copyright decision from the German courts.[36] A September 2002 decision by the Frankfurt Higher Regional Court, while upholding IMS's copyright of the 1860 structure, gave greater rein to IMS's competitors, permitting them more nearly to copy the 1860 structure than had the earlier copyright decision. As a result, NDC was able to sign a number of contracts with large pharmaceutical companies and take a sizeable amount of business from IMS, diminishing the sense of urgency on which the 2001 decision was based.[37] AzyX, on the other hand, had left the market by early 2003.[38] The Commission considered AzyX's exit from the market a further basis for withdrawal of the interim measures.[39]

D.   *The Court of Justice's Decision*

Meanwhile, on a parallel track, the German court had earlier referred to the European Court of Justice the question of how Article 82 applies to the situation at issue. (It is not clear what the German courts would have done with Article 82, considering that the Commission was already on the case.) The ECJ issued its ruling in April 2004.[40] It first ruled on the concept of indispensability, holding that, in determining whether an IPR is "indispensable" for purposes of Article 82, it is necessary to take into account "the degree of participation by users" and "the outlay, particularly in terms of cost, on the part of potential users" to switch.[41]

After confirming that refusal to license an IPR can constitute abuse in exceptional circumstances,[42] the court took the opportunity to clarify the law in this area as developed principally in the *Magill* and *Bronner* cases, setting out the following test:

---

[36]  Commission Decision 2003, 2003 O.J. (L268) [hereinafter "2003 Commission Decision"].

[37]  *Id.* at 71. NDC apparently achieved a market share of around 30%.

[38]  *Id.* Interestingly, a September 2001 ruling by the Frankfurt Higher Regional Court lifted the injunction against AzyX, on procedural grounds, but by April 2003 the injunction was back in place. *CFI President's Decision, supra* note 30, ¶17. It is not clear from the decisions what AzyX was doing in the intervening time.

[39]  The Commission explained:
> As regards AzyX, its withdrawal from the German market for regional pharmaceutical sales data services constitutes a material change in circumstances. To the extent that the Commission's decision sought to preserve the public interest in viable competition on that market until a final decision could be adopted in this case, that objective can no longer be realized by requiring the grant of a licence to AzyX. The grant of such a licence to AzyX therefore is not possible and is no longer urgent.

2003 Commission Decision, *supra* note 36, at 71.

[40]  Case C-418/01, IMS Health GmbH & Co. OHG v. NDC Health GmbH & Co. KG, 2004, *available at* http://www.curia.eu.int/en/content/juris/index.htm [hereinafter *Court of Justice Decision*].

[41]  *Id.* ¶ 30.

[42]  *Id.* ¶ 35.

[T]he refusal by an undertaking which holds a dominant position and owns an intellectual property right in a brick structure indispensable to the presentation of regional sales data on pharmaceutical products in a Member State to grant a license to use that structure to another undertaking which also wishes to provide such data in the same Member State, constitutes an abuse of a dominant position within the meaning of Article 82 EC where the following conditions are fulfilled:

(*) The undertaking which requested the licence intends to offer, on the market for the supply of the data in question, new products or services not offered by the owner of the intellectual property right and for which there is a potential consumer demand;

(*) The refusal is not justified by objective considerations; and

(*) The refusal is such as to reserve to the owner of the intellectual property right the market for the supply of data on sales of pharmaceutical products in the Member State concerned by eliminating all competition on that market.[43]

The Court left it to the German courts to make the necessary factual findings to apply the test. This never happened, as the case ended before any further rulings were issued by either the German courts or the EU authorities.

## II.   EXCEPTIONAL CIRCUMSTANCES?

There are two kinds of monopolization/dominance cases: horizontal and vertical.

A "horizontal" case is one in which the excluding conduct at issue consists of a monopolist's direct dealings (or lack thereof) with competitors. In contrast a "vertical" case is one in which the challenged conduct concerns relations with customers or suppliers—e.g., a refusal to deal or imposition of a restraint. The vertical area includes all those cases falling under the rubrics of exclusive dealing, tying, loyalty discounts, bundling, and predatory pricing.

The free market system rests on the assumptions that separate firms behave separately and that competitors compete.[44] Thus, while we expect firms to sell to their customers and buy from their suppliers—indeed, we would not have much of an economy if they did not—we generally do not

---

[43] *Id.* ¶ 52. The main difference between this formula and the one laid out by the Commission in the Main Decision is the absence of the "new products or services" element from the Commission's test. This gap was filled by the Commission, however, in its recently-released "DG Competition Discussion Paper on the Application of Article 82 of the Treaty to Exclusionary Conduct," *available at* http://ec. europa.eu/comm/competition/antitrust/others/article_82_review.html    [hereinafter    COMPETITION DISCUSSION PAPER].

[44]   *See generally* Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984).

expect them to deal with their competitors. And so any suggestion that a firm ought to be *forced* to deal with a competitor should be viewed with a jaundiced eye.[45]

For that reason, antitrust authorities on both sides of the Atlantic recognize that it is only in the rarest cases that refusing to cooperate with a rival should be prohibited by antitrust law. The Supreme Court in *Verizon Communications Inc. v. Trinko*[46] stated, "We have been very cautious in recognizing such [cases], because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying anticompetitive conduct by a single firm."[47] And it characterized *Aspen Skiing*, the Court's major horizontal monopolization case, as falling "at or near the outer boundary of Sec. 2 liability."[48]

The same is true in the EU. The Court of Justice wrote in the *IMS* case (albeit in the context of IPRs):

> According to settled case-law, the exclusive right of reproduction forms part of the rights of the owner of an intellectual property right, so that refusal to grant a licence, even if it is the act of an undertaking holding a dominant position, cannot in itself constitute abuse of a dominant position.[49]

The question is whether *IMS Health* presented exceptional circumstances.

*IMS Health* was a tempting target for antitrust intervention for several reasons. First, the IPRs in IMS seem tenuous at best; they have the odor of being after-the-fact claims made only when the dominant firm's position was being threatened. (IMS apparently never claimed it had IPRs with respect to the 1860 system until faced with new entry.) To an outside observer, the 1860 brick structure does not seem to have required much creativity. The basic building block of the brick is the postcode and, as the Commission found, any usable system has to be based on it.[50] Of the 1,860 bricks, 500 consist of one postal code. As to the rest, while there was some discretion involved in how to put the postcodes together, these decisions seem to have been based to a significant extent on information provided to IMS by its customers. As one drug company put it, "[I]f one were to create

---

[45] The preceding two paragraphs are based on comments submitted by the author to the Antitrust Modernization Commission in response to a request for his testimony on exclusionary conduct. Exclusionary Conduct: Refusals to Deal and Bundling and Loyalty Discounts: Hearings Before the Antitrust Modernization Commission, (September 29, 2005) (written testimony of Kenneth L. Glazer), *available at* http://www.amc.gov/commission_hearings/pdf/Glazer.pdf.

[46] Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, 540 U.S. 398 (2004).

[47] *Id.* at 408.

[48] *Id.* at 409.

[49] *Court of Justice Decision, supra* note 40, ¶34.

[50] Main Commission Decision, *supra* note 2, at 36.

a brick structure which was useful and well suited to the needs of the indus-
try (and consistent with German and EU privacy law), one would inevitably
arrive at a segmentation very similar to the 1860 brick structure."[51] Indeed,
"[b]oth NDC and AzyX found after creating their brick structures that only
in a small number of cases could these bricks *not* be aggregated to form the
1860 structure."[52] There is nothing in any of the decisions indicating the
size or scope of IMS's investment in the 1860 system.

While some industry standards derive from an entity's IPRs, in this
case the standard seems to pre-date the IPRs. As the Commission put it,

> A dominant company has negotiated over a long period with its customer industry, who are
> now dependent on it, so as to produce a structure which it *subsequently claims* is its intellec-
> tual property, and refuses to license this structure to competitors so that no competing prod-
> ucts based on this structure can be produced.[53]

Moreover, it appears that the copyright was largely based on publicly
available information, though of course some degree of discretion was in-
volved.[54]

Second, and relatedly, IMS's customers had a major role in the devel-
opment of the standard. The process was largely driven by a Working
Group of drug companies formed as far back as the 1970s. This group met
several times a year and formed subgroups.[55] Indeed, in several other EU
countries (Finland and Norway among them) the dominant data service
company is owned by the drug companies themselves.[56] At the very least,
"the Commission's investigation shows that the Working Group played an
extensive role in designing the current structure"[57] and that "the pharma-
ceutical industry in Germany invested considerable resources in ensuring
that the brick structure fully met their requirements."[58]

Third, the competitors were offering, or attempting to offer, an argua-
bly higher-quality service than IMS's. As the Commission explained,
"[a]ccording to customers, [NDC's report] provides for a more complete
coverage of some parts of Germany and provides more detail on types of

---

[51]  *Id.* at 38.

[52]  *Id.* (emphasis added).

[53]  *Id.* at 46 (emphasis added).

[54]  *Id.* at 45. One commentator sets forth facts indicating that IMS did not view itself as having a
copyright in the brick system. Frank Fine, *NDC/IMS: A Logical Application of Essential Facilities
Doctrine*, 23(9) EUR. COMPETITION L. REV. 457 (2002), *available at* http://www.ftc.gov/os/comments/
intelpropertycomments/finefrank.pdf. In this respect—the apparent weakness of the IPRs at issue—*IMS*
is reminiscent of *Magill*.

[55]  Main Commission Decision, *supra* note 2, at 27-28.

[56]  *Id.* at 40.

[57]  *Id.* at 27.

[58]  *Id.* at 28.

information, such as re-imported products and products returned to whole-salers."[59] At the least, competitors' presence would presumably have in-jected price competition into the market. Not surprisingly, then, more than 40 customers testified on behalf of NDC while none testified on IMS's behalf.

Finally, the competitors here were not trying to free-ride on the defen-dant's investment, at least from one perspective. NDC and AzyX wanted nothing to do with IMS. Only the copyright ruling by the German court put them in the position of having to seek IMS's assistance, and even then all they wanted was not to be sued for copyright infringement. They were not seeking to enter into a long-term and complex supplier-customer relation-ship for a key raw ingredient or the like.

This is in sharp contrast to cases like *Commercial Solvents,* in which the complainant sought to buy certain raw materials from the dominant firm,[60] and *Bronner*, in which the complainant sought access to the defen-dant's newspaper-delivery system.[61] In those cases, the plaintiff was seek-ing to deal directly with the defendant. Here the competitors wanted noth-ing to do with the dominant firm but were forced by the copyright ruling into an unwanted relationship.

In short, the circumstances present in the case would seem to be fairly "exceptional." The dominant firm seems to have derived its grip on the market not "by virtue of superior skill, foresight and industry," to use the Learned Hand's phrase from *Alcoa,* but simply by virtue of being the first mover.[62] That being the case, it is tempting to find IMS's refusal to license an abuse of its dominant position. With a stroke of the pen, the Commission could introduce new and much-needed competition into this critical market. The positive effects of such a move would even be felt beyond Germany: some evidence suggested that the competitors' inability to compete in Ger-many may have hampered them in Europe generally, because of their in-ability to offer customers a multi-jurisdiction package.[63]

---

[59]  *Id.* at 20 (explaining how AzyX's service differs from IMS's). NDC apparently had already developed a web-based delivery system.

[60]  Cases 6/73 & 7/73, Istituto Chemioterapico Italiano S.p.A. and Commercial Solvents Corp. v. Comm'n of the Eur. Comtys., 1974 E.C.R. 223.

[61]  Case C-7/97, Oscar Bronner GmbH & Co. KG. v. Mediaprint Zeitungs und Zeitschriftenverlag GmbH & Co KG, 1998 E.C.R. 207.

[62]  U.S. v. Aluminum Co. of Am., 148 F.2d 416, 430 (2d Cir. 1945); *see also* United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966) ("The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a conse-quence of a superior product, business acumen, or historic accident.").

[63]  Main Commission Decision, *supra* note 2, at 19. Interestingly, the Commission had separately investigated IMS for offering precisely such packages. *See* Press Release, Eur. Comm'n, Commission Initiates Formal Procedure Against Certain Practices of Intercontinental Marketing Services, Reference

III.  RESISTING THE TEMPTATION

But temptations, even the most tantalizing, must sometimes be resisted. In *Trinko*, the Supreme Court explained the dangers of imposing antitrust liability in horizontal monopolization cases:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it [1] may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities. Enforced sharing also [2] requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill-suited. [3] Moreover, compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion.[64]

Admittedly, the second and third concerns are not particularly salient here. Selecting an independent expert is not the same as becoming a "central planner" or regulatory body. To the contrary, choosing independent experts is a fairly standard task of courts, not a classic regulatory exercise.[65] And as to the collusion concern, that seems tenuous. NDC and AzyX merely sought a license from IMS. Once the royalty had been set, there would be no need for continuing discussions on competitively sensitive subjects such as the price being charged for the data services.

But the first concern—the lessening of incentives—is overriding. And this is true regardless of the exact level of IMS's investment. It may be that IMS's investment in creating the brick system was small relative to its revenues or profits. One might argue that forcing IMS to share that system with its rivals would have little impact on future incentives. Indeed, this seems to be what the Commission has in mind in its Article 82 Discussion Paper when it says, "and the investments behind innovations leading to intellectual property rights may not have been particularly significant, in which case it may be likely that the investment would have been made even knowing that a duty to supply would be imposed."[66] This is especially so if IMS would receive a license fee, which, in theory, would reimburse it for the costs it incurred in developing the system.

---

IP/00/1207 (Oct. 24, 2000), *available at* http://europa.eu.int/rapid/searchAction.do; Press Release, Eur. Comm'n, Commission Closes Certain Proceedings Against IMS Health, Reference IP/02/1430 (Oct. 4, 2002), *available at* http://europa.eu.int/rapid/searchAction.do (finding the conduct had stopped).

64  Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, 540 U.S. 398, 407-08 (2004).

65  *But cf.* Valentine Korah, *The Interface Between Intellectual Property and Antitrust: The European Experience*, 69 ANTITRUST L. J. 801, 826 (2002) (criticizing open-endedness of the order with respect to the royalty).

66  COMPETITION DISCUSSION PAPER, *supra* note 43, ¶ 236.

But that is the wrong way to look at the question. Even if IMS's investment was small, however measured, at issue here is the entire system of IPRs. IMS was vindicating its claimed copyright in the 1860 brick system. The copyright may be questionable, but that was a decision for the German courts to make—and they made it. Without that decision, IMS could not do anything on its own to exclude competitors (short of fraud, which could be separately attacked as an abuse). This has to trump everything else in the case. The Commission's decision was a frontal assault on the system of IPRs, and it is this aspect that has understandably concerned commentators.[67]

This point has been made in several U.S. cases, most forcefully in the First Circuit's decision in *Data General Corp. v. Grumman Systems Support Corp.*[68] The antitrust defendant (and copyright plaintiff), Data General, was a supplier of computers and refused to license its proprietary maintenance diagnostic software to third-party maintenance companies like the plaintiff, making it harder for those companies to compete with the defendant in the market for the maintenance of its computers. Because Data General had a copyright in that diagnostic software, the case presented, in the court's words, "a curious conflict, namely, whether (and to what extent) the antitrust laws, in the absence of any statutory exemption, must tolerate short-term harm to the competitive process when such harm is caused by the otherwise lawful exercise of an economically potential 'monopoly' in a copyrighted work"[69]—exactly the issue present in *IMS Health*. As in *IMS Health*, there was no question that competition in the market would have increased, at least in the short run, by forcing Data General to license the copyright. Rather, the issue was the sanctity of the copyright system:

> [I]n passing the Copyright Act, Congress itself made an empirical assumption that allowing copyright holders to collect license fees and exclude others from using their works creates a system of incentives that promotes consumer welfare in the long term by encouraging investment in the creation of desirable artistic and functional works of expression. . . . *We can-*

---

[67] Several commentators expressed great concern, saying the decision "strikes at the heart of intellectual property." Maurits Dolman, *Standards for Standards,* 26 FORDHAM INT'L L.J. 163, 200 (Nov. 2002). *Accord* Donna M. Gitter, *Strong Medicine for Competition Ills: The Judgment of the European Court of Justice in the IMS Health Action and Its Implications for Microsoft Corporation*, 15 DUKE J. COMP. & INT'L L. 153, 178-186 (2004); Abbot B. Lipsky, Jr., *To the Edge: Maintaining the Incentives for Innovation After the Global Antitrust* Explosions, 35 GEO. J. INT'L L. 521, 540-41 (2004); Paul D. Marquardt & Mark Leddy, *The Essential Facilities Doctrine and Intellectual Property Rights: A Response to Pitofsky, Patterson and Hooks*, 70 ANTITRUST L.J. 847 (2003).

[68] Data General Corp. v. Grumman Systems Support Corp., 36 F.3d 1147 (1st Cir. 1994). *See also* Marquartdt & Leddy, *supra* note 67 (discussing these cases at length).

[69] *Data Gen. Corp.*, 36 F.3d at 1152.

> not require antitrust defendants to prove and reprove the merits of this legislative assump-
> tion in every case where a refusal to license a copyrighted work comes under attack.[70]

The same basic assumption underlies the IPR systems in the EU.[71] This does not mean that a refusal to license is completely immune from antitrust attack, because "the Copyright Act does not explicitly purport to limit the scope of the Sherman Act."[72] To "harmonize the two [copyright law and antitrust law] as best we can," the court held that "while exclusionary conduct can include a monopolist's unilateral refusal to license a copyright, an author's desire to exclude others from use of its copyrighted work is a presumptively valid business justification for any immediate harm to consumers."[73] This can be rebutted, but only "by evidence that the copyrights were obtained by unlawful means or were used to gain monopoly power beyond the statutory copyright granted by Congress."[74]

At first this might not seem very different from the *IMS* approach, which speaks of "exceptional circumstances." But it is, because the Commission's decision contained no suggestion that the copyright was obtained by unlawful means, nor was there any suggestion that it was used to gain a monopoly beyond the scope of the copyright; yet the Commission found an abuse. That finding was based on IMS's dominance in the German market, the indispensability of the 1860 brick system, IMS's refusal to license it to NDC and AzyX, and the lack of any "objective justification."

The Commission's Discussion Paper on Article 82 is no different in this key respect. The document does contain strong and useful language on IPRs:

---

[70] *Id.* at 1186-87 (emphasis added); *see also* U.S. Dep't of Justice and the Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* 4 (1995) ("As with any other tangible or intangible asset that enables its owner to obtain significant supracompetitive profits, market power (or even a monopoly) that is solely 'a consequence of a superior product, business acumen, or historic accident' does not violate the antitrust laws. *Nor does such market power impose on the intellectual property owner an obligation to license the use of that property to others.*") (citation omitted) (emphasis added), *available at* http://www.usdoj.gov/atr/public/guidelines/0558.pdf; A.B.A. SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS 1077 (5th ed. 2002) (collecting cases).

[71] *See, e.g., CFI President's Decision, supra* note 31, ¶ 125 ("The fundamental rationale of copyright is that it affords the creator of inventive and original works the exclusive right to exploit such works, thereby ensuring that there is a 'reward for the creative effort.'") (citing Case 158/86 Warner Bros. & Metronome Video v. Christiansen, 1988 E.C.R. 2605 ¶ 13 and Opinion of Advocate General Mr. Gulmann, Joined Cases C-241/91 P & C-242/91 P, Radio Telefis Eireann (*RTE*) & Indep. Television Publ'ns (*ITP*) Ltd. v Comm'n of the Eur. Comtys., 1995 E.C.R. I-743 ¶ 56m), "It must not be forgotten that to a certain extent copyright law—like other intellectual property rights—also serves to promote competition." *RTE & ITP, supra* at n.11.

[72] *Data Gen. Corp.*, 36 F.3d at 1187.

[73] *Id.*

[74] CSU, L.L.C. v. Xerox Corp. (In re Indep. Serv. Orgs. Antitrust Litig.), 203 F.3d 1322, 1328-29 (Fed. Cir. 2000) (characterizing the holding of *Data Gen. Corp.*).

> There is no general obligation for the IPR holder to license the IPR, not even where the holder acquires a dominant position in the technology or product market. The very aim of the exclusive right is to prevent third parties from applying the IPR to produce and distribute products without the consent of the holder of the rights. This protection would be eroded if the holder of a successful IPR would be required to grant a licence to competitors from the moment the IPR or the product incorporating the IPR becomes dominant in the market. Imposing on the holder of the rights the obligation to grant to third parties a licence for the supply of products incorporating the IPR, even in return for a reasonable royalty, would lead to the holder being deprived of the substance of the exclusive right.[75]

To be sure, the Discussion Paper does put the focus where it should be—on incentives.[76] But then the document suggests that the IPR holder will flunk the "efficiency" test if the "investments behind innovations leading to intellectual property rights may not have been particularly significant."[77] This is no different from *IMS*, which turned on the perception that the IPR holder there did not truly deserve its rights. It would make the IPR holder "prove and reprove" the policy behind the copyright system in every case.

It is tempting to strip an IPR holder of its IPRs when its investment was "not significant." But then we are back to revisiting the validity of the IPRs, something that can and should be done in the copyright proceeding, not in an antitrust proceeding. It makes no sense to take away in an antitrust proceeding the exclusive right the law gave in a copyright proceeding. The degree of creativity and originality present are factors that should be taken into account in a copyright proceeding. And in this case it appears that the copyright system began correcting itself almost immediately; by the time of the Commission's 2003 decision, NDC had been able to acquire customers in light of a 2002 ruling by the Frankfurt Higher Regional Court.[78]

---

[75]  COMPETITION DISCUSSION PAPER, *supra* note 43, ¶ 238.

[76]  *Id.* ¶ 236 ("The circumstances in which a refusal to supply by a dominant company may be abusive are therefore more likely to be present when it is likely that the investments that have led to the existence of the indispensable input would have been made even if the investor had known that it would have a duty to supply.").

[77]  *Id.* A later paragraph of the Discussion Paper appears to go even further, stating that "[a] refusal to license an IPR protected technology which is indispensable as a basis for follow-on innovation by competitors may be abusive *even if the licence is not sought to directly incorporate the technology in clearly identifiable new goods and services." Id.* ¶ 240 (emphasis added).

[78]  2003 Commission Decision, *supra* note 36, ¶ 13. How would IMS's copyright claim have fared under U.S. law? It's not entirely clear. Under U.S. law, an "arrangement" of data, such as the 1860 system, is copyrightable, and only minimal creativity is required. *See* Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 345 (1991). On the one hand, IMS did seem to engage in some degree of "creativity" with respect to at least some bricks. On the other hand, "Both NDC and AzyX found after creating their brick structures that only in a small number of cases could these bricks *not* be aggregated to form the 1860 structure." Main Commission Decision, *supra* note 2, at 38 (emphasis added). This suggests that, as in the alphabetical listing at issue in the *Feist* yellow pages case, the 1860 brick system "is not only unoriginal, it is practically inevitable." *Id.* at 363. But whatever the outcome on the copy-

7/11/2006 9:22:44 PM

Besides, how do we determine whether an investment is "significant" enough to uphold the IPR? The very vagueness of this standard is bound to have a chilling effect on innovation, with businesses having to determine whether their proposed investments in innovation are "significant" enough to immunize them from antitrust proceedings. Businesses need certainty, and the Commission's approach fails to supply it. Once we start making exceptions to the rule that a copyright owner can refuse to license third parties, where do we stop making exceptions?

This point is well illustrated in *IMS* by the fact that even the Court of First Instance took a different view of the level of IMS's investment in the 1860 brick system. The Court of First Instance wrote that IMS "has been investing resources in developing the brick-structure-based, data-report services in Germany since 1969." This is a very different tone from the Commission decision, which focuses on how *little* IMS did and how much it relied on the drug companies.

To be sure, under a rule of per se legality, competition might suffer in the short run. But that is true of everything involving monopolies. We can always "turn upon" the successful monopolist (to use Learned Hand's phrase) to create a more competitive market structure in the short run.[79] But that approach commits the "something for nothing" fallacy by failing to consider the very real costs of doing so, viewing the world only from the *ex post* perspective and ignoring the *ex ante*.[80]

But what about the claim that the IPRs in *IMS Health* were an industry standard? That's not an "exceptional circumstance" because that potential exists in all IPR cases and is tantamount to saying that we will strip the IPR holder of its rights only if it has been very successful. Nor should an exceptional circumstance be found based on the fact that NDC and AzyX had no desire to deal with IMS because, again, that will usually be true in IPR cases.

Then what about the fact that customers played an important role in the IMS drama? Should not that make a difference? No. In the first place,

---

rightability question, IMS would probably have had an uphill battle proving the "copying" element. Facts, of course, are not copyrightable, and IMS's competitors seemed capable of developing their own 1860-compatible system based on the same facts that IMS used in developing its system. For a discussion of U.S. cases involving similar compilations, see *Nimmer on Copyright* §3.04[B][2] (2004).

[79] U.S. v. Aluminum Co. of Am., 148 F.2d 416, 430 (2d Cir. 1945) ("The successful competitor, having been urged to compete, must not be turned upon when he wins.").

[80] *See, e.g.*, Einer Elhauge, *Defining Better Monopolization Standards* 56 STAN. L.REV. 253, 296 (2003) ("Such an ex post approach ignores the ex ante reality that it is precisely the prospect of being able to exclude rivals from one's property and charge a price above the marginal cost of using it that is necessary to encourage the prior investments that created the property, or enhanced or maintained its value.").

it's not necessarily unusual for customers to play a significant role in the development of IPRs. As one commentator explains, "Customer participation in the creation of intellectual property is commonplace and necessary . . ."[81] Second, like the amount of creativity employed by the IPR holder, customer involvement is a factor that is, or at least can be, taken into account in the initial copyright determination.[82] Third, in future cases customers can perhaps take greater pains to protect themselves by, for example, contractually retaining the IPRs to the brick system as an industry rather than letting IMS claim those rights. In fact, it is something of a mystery that the customers here did not do that in Germany given that they did that in some other countries, as mentioned above.[83] The Commission decision sheds little light on this question, failing to mention, for example, whether and to what degree the customers played any role in the copyright proceedings. It is hard to know what to make of the drug companies' passivity. Valentine Korah offers one intriguing possibility—that they tried to retain the IPRs but IMS made clear that "would not have taken the trouble to devise the brick structure without the expectation of the exclusive right to use it."[84] But that's just one possibility among others. Another is that they held back from IPR ownership on advice of competition-law counsel. In fact, drug-company collusion is a whole side of the case left untouched by any of the opinions or subsequent commentary, and yet it may well have been part of the case's backdrop.

But if we cannot employ a micro, or case-by-case, incentives analysis in an *IMS*-type situation, then would not that preclude such an approach in non-IP situations? No, because IPRs are very different from other property in a key respect. An IPR is expressly designed to exclude; non-IP property is not. To be sure, if you own a plant, your competitor cannot come in and start using it. But your ownership of a plant does not prevent your competitors from building their own; they just cannot build their plants on your land. However, when you hold an IPR, a competitor cannot simply copy what you are doing. For that reason, the approach taken by the Commission's Discussion Paper is probably the right one for non-IPRs: "The circumstances in which a refusal to supply by a dominant company may be abusive are therefore more likely to be present when it is likely that the investments that have led to the existence of the indispensable input would

---

[81] Gitter, *supra* note 67, at 178.

[82] *Id.* at 179. ("A significant degree of customer involvement might affect a court's assessment of who possesses ownership rights in that property, as the Frankfurt Higher Regional Court concluded in the IMS action.").

[83] *See supra* text accompanying note 56. The German courts found that the drug companies had a co-copyright with IMS, which meant that the rivals would need licenses from both. Of course, getting licenses from the drug companies was not an obstacle to NDC, unlike obtaining licenses from IMS.

[84] Korah, *supra* note 65, at 828.

have been made even if the investor had known that it would have a duty to supply."[85]

## IV. LIMITATIONS ON IP IMMUNITY

The immunity proposed here does not provide a *carte blanche* to violate the antitrust laws. It merely covers refusals to license rivals. Merely because a product or service one sells incorporates IPRs does not mean that anything one does with that product or service is immune. As the D.C. Circuit in *Microsoft* explained, the proposition that a firm has "an absolute and unfettered right to use its intellectual property as it wishes [is] no more correct than the proposition that use of one's personal property, such as a baseball bat, cannot give rise to tort liability."[86]

One example is the classic refusal to deal with "disloyal" customers. Thus, if IMS were to tell customers that it would stop selling data services to them if they deal with NDC or AzyX, that would reach beyond the scope of the rights inherent in copyright. The copyright grants "the right to decide whether or not to grant licenses to third parties."[87] It does not grant the right to refuse to sell a product or service incorporating that right where such refusal would otherwise violate antitrust law. And a refusal to sell to disloyal customers can certainly, in the right circumstances, violate antitrust law.

To illustrate, the *Lorain Journal* newspaper, for example, was not immune from antitrust law when it stopped selling advertising space to advertisers that wanted to buy advertising time on the Journal's radio-station competitor, just because the Journal contains copyrighted material.[88] Nor was Dentsply immune when it stopped selling its artificial teeth to dental dealers that wanted to deal with competitors, just because Dentsply had a patent in some of its tooth designs.[89] IMS did apparently threaten some customers that they could be liable for copyright infringement themselves if they dealt with NDC or AzyX,[90] but that is different from refusing to sell to disloyal customers: the only customers that would be sued for copyright infringement presumably were those customers that had already stopped dealing with IMS because they replaced IMS with NDC or AzyX (in violation of its copyright, IMS would argue).

---

[85] COMPETITION DISCUSSION PAPER, *supra* note 43, ¶ 236. The other elements of an abuse must of course be satisfied—e.g., dominance or monopoly power.

[86] United States v. Microsoft Corp., 253 F.3d 34, 63 (D.C. Cir. 2001).

[87] *CFI President's Decision*, *supra* note 31, ¶ 88.

[88] *See* Lorain Journal Co. v. United States, 342 U.S. 143 (1951).

[89] *See* United States v. Dentsply Int'l, Inc., 399 F.3d 181 (3d Cir. 2005).

[90] Main Commission Decision, *supra* note 2, at 22.

7/11/2006 9:22:44 PM

Another example of conduct outside the scope of the IP immunity is tying. Thus, for example, IMS might say to customers, "I will sell you German data services only if you also purchase my French and British services." This would be classic tying and, again, should not be immune merely because the German services—the "tying" product in this case— incorporate IPRs. And again, notice that this type of conduct is about dealings with customers (in this case, a conditional refusal to deal), not dealings with competitors, reaching back to the distinction between horizontal and vertical monopolization scenarios.

CONCLUSION

It seems unfair that one company should enjoy the advantage of the brick system that was widely used by industry simply because it was the first mover and locked its customers into its particular system. IMS did not seem to have done anything particularly creative in developing the brick system that became the de facto industry standard. It is tempting to ignore the fact that IMS had a copyright in that brick system and treat it as a public utility.

But IMS did have a copyright, and that makes all the difference. The main idea of a copyright system is to create exclusion. If we want the law to limit the degree or amount of exclusion, we should enact that limitation in the copyright system. But it makes little sense to take away in an antitrust proceeding that which was given by the copyright system. To be sure, IMS's success was probably more "historic accident" than "superior product or business acumen," but all three of those factors fall on the same side of the *Grinnell* ledger.[91] After all, being in the right place at the right time is not always a matter of dumb luck.

---

[91] Marquardt & Leddy, *supra* note 67, at 859 n. 38 ("To the extent that the competitive impact of IMS HEALTH's copyright is heightened by the fact that customers also configured their computer and compensation systems to use the brick structure during the period when IMS HEALTH, the first mover in the market, was the only data service available, that fact is attributable to 'historic accident' rather than any malign behavior and also does not violate Section 2.").

# EXHIBIT 7

**Notices**
1:07-cv-09606-NRB Securities and Exchange Commission v. Dorozhko
ECF

U.S. District Court

**United States District Court for the Southern District of New York**

## Notice of Electronic Filing

The following transaction was entered by Ross, Charles on 11/6/2007 at 11:24 AM EST and filed on 11/6/2007

**Case Name:**      Securities and Exchange Commission v. Dorozhko
**Case Number:**    1:07-cv-9606
**Filer:**          Oleksandr Dorozhko
**Document Number:** 7

**Docket Text:**
NOTICE OF APPEARANCE by Charles Albert Ross on behalf of Oleksandr Dorozhko (Ross, Charles)

**1:07-cv-9606 Notice has been electronically mailed to:**

Robert B. Blackburn      BlackburnR@SEC.GOV

Charles Albert Ross      cross@carossassoc.com

Carl Alan Tibbetts      TibbettsC@SEC.Gov

**1:07-cv-9606 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1008691343 [Date=11/6/2007] [FileNumber=3971606-0
] [98faaf15896fee6f74749f12fe416ce596b62c0c500f21762d748345d6725eb2c51
24c7e99bc1f43d3123ee815a2bec0e1be73967c40ede6215d8992faf6001c]]

# EXHIBIT 8

## Chris Padurano

| | |
|---|---|
| **From:** | Chris Padurano |
| **Sent:** | Tuesday, November 06, 2007 10:49 AM |
| **To:** | Robert Blackburn |
| **Subject:** | SEC v. Dorozhko |

Robert:

We haven't spoken just yet, but I work for Chuck Ross. I know you and he discussed a possible adjournment in the Dorozhko matter. However, it appears we will be able to file our papers by the end of the day and thus, an adjournment will be unnecessary. I plan on electronic filing the materials this afternoon and then e-mailing both you and Carl Tibbetts copies of what we file. Of course, should you have any questions, please do not hesitate to contact me. Thanks.

Chris

**Christopher L. Padurano, Esq.**
Charles A. Ross & Associates, LLC
Trinity Centre
111 Broadway, Suite 1401
New York, New York 10006
212.616.3034 (T)
212.616.3035 (F)

This email communication is confidential and is intended only for the individual(s) or entity named above and others who have been specifically authorized to receive it. It may contain confidential, proprietary or legally privileged information or may otherwise be protected by work product privilege. No confidentiality or privilege is waived or lost by any mistaken or inadvertent transmission. If you are not the intended recipient, please do not read, copy, use or disclose the contents of this communication to others. Please notify the sender that you have received this email in error by replying to the email or by calling 212.616.3030 during normal business hours. Please then delete the email and any copies of it. Thank you.