UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| *Plaintiff,* | : |
| | : |
| -v.- | : |
| | : |
| OLEKSANDR DOROZHKO | : |
| | : |
| *Defendant,* | : |
| | : |

Case No.  07 CIV 9606 (NRB)

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT AGAINST DEFENDANT OLEKSANDR DOROZHKO**

.

.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. ii

I.    PROCEDURAL HISTORY.............................................................................................. 1

II.   MATERIAL FACTS ..................................................................................................... 3

III.  ARGUMENT ............................................................................................................... 9

      A.    The Standard For Summary Judgment .................................................................... 9

      B.    The Proscriptions Of Section 10(b) Of The Exchange Act And Rule 10b-5........ 10

      C.    Defendant Dorozhko Should Be Enjoined............................................................. 16

      D.    Defendant Dorozhko Should Pay Disgorgement And Prejudgment Interest........ 18

      E.    Defendant Dorozhko Should Pay Civil Money Penalties..................................... 19

CONCLUSION.............................................................................................................. 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

A. T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967) .......................................................... 15

Aaron v. SEC, 446 U.S. 680 (1980) ......................................................................................... 12

Basic Inc. v. Levinson, 485 U.S. 224 (1988) ............................................................................ 11

Baxter v. Palmigiano, 425 U.S. 308 (1976) ............................................................................. 14

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ........................................................................ 10

Collazos v. United States, 368 F.3d 190 (2d Cir. 2004) ........................................................... 15

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976) ............................................................. 12, 15

Herman & MacLean v. Huddleston, 459 U.S. 375 (1983) ........................................................ 12

Homans v. SEC, 434 U.S. 834 (1977) ...................................................................................... 16

In re Apple Computer Securities Litigation, 496 U.S. 943 (1990) ............................................ 12

In re Apple Computer Securities Litigation, 886 F.2d 1109 (9th Cir. 1989) .............................. 12

Lombardfin S.p.A. v. SEC, 486 U.S. 1014 (1988) .................................................................... 18

Mitchell v. United States, 526 U.S. 314 (1999) ....................................................................... 14

Muscat v. Norte & Co., 397 U.S. 989 (1970) ........................................................................... 18

Norte & Co. v. Huffines, 416 F.2d 1189 (2d Cir. 1969) ........................................................... 18

Rolf v. Blyth, Eastman Dillon & Co., 637 F.2d 77 (2d Cir. 1980) ............................................. 18

SEC v. Blavin, 760 F.2d 706 (6th Cir. 1985) ........................................................................... 18

SEC v. Cavanagh, et al., 2004 U.S. Dist. LEXIS 13372 (S.D.N.Y. July 16, 2004) ..................... 10

SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90 (2d Cir. 1978) ...................................... 16

SEC v. Dorozhko, 574 F.3d 42 (2d Cir. 2009) .............................................................. 2, 3, 11, 12

SEC v. Dorozhko, 606 F. Supp. 2d 321 (S.D.N.Y. 2008) ........................................... 2, 11, 12, 13

SEC v. Federated Alliance Group, Inc., 1997 U.S. Dist. LEXIS 9075 (W.D.N.Y. June 23, 1997) ..................................................................................................................... 16

SEC v. Ferrero, 1993 U.S. Dist. LEXIS 21379 (S.D. Ind. Dec. 2, 1993).................................... 19

SEC v. First City Fin. Corp., 890 F.2d 1215 (D.C. Cir. 1989) ..................................... 18

SEC v. First Jersey Securities, Inc., 101 F.3d 1450 (2d Cir. 1996) .................................. 16

SEC v. First Jersey Securities, Inc., 522 U.S. 812 (1997)................................................. 16

SEC v. Maio, 51 F.3d 623 (7th Cir. 1995).................................................................. 19

SEC v. Musella, 678 F. Supp. 1060 (S.D.N.Y. 1988) ................................................... 10

SEC v. Musella, 748 F. Supp. 1028 (S.D.N.Y. 1989) ................................................... 18

SEC v. Sekhri, 2002 U.S. Dist. LEXIS 13289 (S.D.N.Y. July 22, 2002)........................................ 19

SEC v. Shah, 1993 U.S. Dist. LEXIS 10347 (S.D.N.Y. July 28, 1993) ...................................... 19

SEC v. Stephenson, 732 F. Supp. 438 (S.D.N.Y. 1990)................................................. 18

SEC v. Tome, 833 F.2d 1086 (2d Cir. 1987)................................................................. 18

SEC v. Universal Major Indus. Corp., 546 F.2d 1044 (2d Cir. 1976).......................................... 16

SEC v. Zandford, 535 U.S. 813 (2002)................................................................. 2, 11

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148 (2008)........................... 12

Superintendent of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6 (1971) .............................. 15

U.S. v. Finnerty, 533 F.3d 143 (2d Cir. 2008) ............................................................. 11

## STATUTES AND RULE

Securities Exchange Act of 1934, Rule 10b-5 [17 C.F.R. § 240.10b-5].................................... passim

Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] ............................ passim

Section 21A(a)(2) of the Securities Exchange Act of 1934 [15 U.S.C. 78u-1(a)(2) .................... 19

# FEDERAL RULES OF CIVIL PROCEDURE

Rule 1 ................................................................................................................................ 10

Rule 56 ................................................................................................................................ 3

Rule 56(c) ...................................................................................................................... 9, 10

Rule 56(e) .......................................................................................................................... 10

# MISCELLANEOUS

H.R. Rep. No. 98-355, 98th Cong., 2d Sess., 7-8 (1984), reprinted in 1984 U.S.C.C.A.N. 2274,

    2280-81 ............................................................................................................................ 19

Hearings on H.R. 7852 and H.R. 8720 before the House Committee on Interstate and Foreign

    Commerce, 73d Cong., 2d Sess., 115 (1934) .......................................................... 15

Plaintiff, Securities and Exchange Commission ("SEC"), submits this memorandum in support of its motion pursuant to Fed. R. Civ. P. 56(a) for an order granting summary judgment against defendant Oleksandr Dorozhko ("Dorozhko").

## I.     PROCEDURAL HISTORY

On October 29, 2007, the SEC filed a Complaint against defendant Dorozhko and sought, among other things, a temporary restraining order freezing defendant Dorozhko's assets and an order to show cause why a preliminary injunction should not issue against defendant Dorozhko. The SEC's Complaint charges defendant Dorozhko with violating the antifraud provisions of the federal securities laws by, among other things, hacking into a secure computer network operated by Thomson Financial,[1] obtaining material nonpublic information about IMS Health Incorporated ("IMS Health"), and thereafter trading in put options on IMS Health common stock. On the same date, this Court granted a temporary restraining order freezing the proceeds of defendant Dorozhko's trades.

Defendant Dorozhko refused to provide any discovery, invoked his Fifth Amendment rights, and moved to dismiss the Complaint and to vacate the Court's temporary restraining order. This Court conducted a preliminary injunction evidentiary hearing on November 28, 2007, and heard oral arguments on the motions of the SEC and defendant Dorozhko. At this hearing, the SEC presented evidence showing that, shortly before IMS Health announced its third quarter 2007 earnings on October 17, 2007, via Thomson Financial, a computer hacker infiltrated the secure computer network of Thomson Financial and unlawfully obtained IMS Health's confidential earnings information. Within minutes of this hack, and just before IMS

---

[1]     Thomson Financial is an investor relations services firm and a division of the Thomson Corporation (Thomson Reuters).

1

Health's scheduled earnings release, Dorozhko embarked on and completed an aggressive campaign to buy IMS Health put options.

On January 8, 2008, this Court entered a Memorandum and Order ("Memorandum and Order") that made detailed findings of fact and conclusions of law in the context of a motion for preliminary injunction. In the Memorandum and Order, this Court concluded that violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder "require a showing of three essential elements: (1) a 'device or contrivance'; (2) which is 'manipulative or deceptive'; and (3) used 'in connection with' the purchase or sale of securities." SEC v. Dorozhko, 606 F. Supp. 2d 321, 327-28 (S.D.N.Y. 2008).[2] However, this Court concluded that, since the SEC did not offer any evidence showing that defendant Dorozhko breached a fiduciary duty, the SEC's hacking claim under Section 10(b) of the Exchange Act and Rule 10b-5 should be dismissed, the SEC's motion for a preliminary injunction denied, and the asset freeze dissolved. See id. at 324.

The SEC appealed and, on July 22, 2009, the Second Circuit vacated this Court's order and remanded this case:

> "Having established that the SEC need not demonstrate a breach of fiduciary duty, we now remand to the District Court to consider, in the first instance, whether the computer hacking in this case involved a fraudulent misrepresentation that was 'deceptive' within the ordinary meaning of Section 10(b). The District Court may, in its informed

---

[2] The Second Circuit later noted, with seeming approval of this Court's view:

"In the District Court's view, 'the alleged 'hacking and trading' was a 'device or contrivance' within the meaning of the statute.' Dorozhko, 606 F. Supp. 2d at 328. The District Court further observed that the scheme was 'in connection with' the purchase or sale of securities because the close temporal proximity of the hacking to the trading (everything occurred in less than twenty-four hours) and the cohesiveness of the scheme (establishing the trading account, stealing the confidential information within minutes of its availability, and trading on it within minutes of the next day's opening bell) suggest that hacking into the Thomson computers was part of a single scheme to commit securities fraud. See id. at 328-29; see also SEC v. Zandford, 535 U.S. 813, 822 (2002) (holding that 'in connection with' means 'to coincide')."

SEC v. Dorozhko, 574 F.3d 42, 45-46 n.3 (2d Cir. 2009).

discretion, enter a new order on the basis of the existing record or reopen the preliminary injunction hearing to consider such additional testimony regarding the nature of the hacking in this particular case as it deems appropriate in the circumstances."

SEC v. Dorozhko, 574 F.3d 42, 51 (2d Cir. 2009).

This Court held a status conference on November 30, 2009. At that hearing, counsel for defendant Dorozhko stated that he had been unable to contact his client for several months. This Court granted the SEC's request to file a motion for summary judgment against defendant Dorozhko and set a briefing schedule.

Based on the evidentiary record in this case and the law of the case, as supplemented by the declarations accompanying the motion at bar, and for the reasons stated below, the SEC submits that there is no genuine issue of material fact remaining in this case and respectfully requests that this Court (1) grant the SEC's motion for summary judgment; and (2) issue a final judgment of permanent injunction and other relief against defendant Dorozhko under Fed. R. Civ. P. 56.

## II.    MATERIAL FACTS

Defendant Dorozhko is a self-employed Ukrainian national residing in Uzhgorod, Ukraine. (Declaration of Paul A. Gumagay dated October 29, 2007 ("Gumagay Decl.") ¶¶ 3-4 and Exs. B and C). On or about October 4, 2007, defendant Dorozhko opened an online trading account with Interactive Brokers LLC ("Interactive Brokers") and wire-transferred $42,500 to his account. (Declaration of Martin J. Ward dated November 9, 2007 ("Ward Decl.") ¶¶ 4, 7). Interactive Brokers is an internet broker registered and based in the United States. (Ward Decl. ¶¶ 1, 11 and Ex. 3). In his application to open the account, defendant Dorozhko stated that he had an annual income of $45,000 – $50,000 and a net worth of $100,000 – $250,000. (Ward Decl. ¶ 4).

IMS Health Inc. is a publicly-traded company headquartered in Norwalk, Connecticut. (Declaration of Michael Fox dated November 9, 2007 ("Fox Decl.") ¶ 1; Ward Decl. ¶ 8). On October 9, 2007, IMS Health publicly announced that it planned to release its third quarter 2007 earnings after the close of the stock market on October 17, 2007. (Fox. Decl. ¶ 4; Dorozhko Preliminary Injunction Hr'g ("Hr'g") Tr. at 69-70 and Dorozhko Hr'g Ex. A). Prior to the earnings announcement, no major media or analyst anticipated negative earnings for IMS Health for the third quarter 2007. (Fox Decl. ¶ 4). To the contrary, in the months leading up to the release of IMS Health's third quarter 2007 earnings, analysts had rated IMS Health shares as "market perform" and "peer perform," and one major analyst had upgraded the stock. (Hr'g Tr. at 80-81 and Dorozhko Hr'g Ex. D). In preparing for the release of the third quarter 2007 earnings information, IMS Health, its employees and its agents took steps to maintain the confidentiality of the earnings information to ensure that no one could access and exploit the information for personal benefit prior to the public release. (Fox Decl. ¶ 4).

For several years prior to October 17, 2007, Thomson Financial has hosted IMS Health's investor relations website and provided secure webcasting and audio casting services for IMS Health's public release of earnings information. (Hr'g Tr. at 23-24, 28). Thomson Financial provides similar services to many Fortune 500 companies. (Hr'g Tr. at 24-25). Thomson Financial sought to assure the confidentiality of client information and to preserve its own reputation for computer network security. (Id.). It had multi-layered procedures in place to prevent access to confidential information, such as IMS Health's 2007 third quarter results, by anyone except authorized IMS Health and Thomson Financial personnel prior to public release. (Hr'g Tr. at 24-27, 51). The Thomson Corporation spent over $10 million for each of several years before 2007 and continuing to the present for network security. (Declaration of Timothy

Mathias dated January 28, 2010 ("Mathias Decl.") ¶ 9). It employed numerous dedicated information technology professionals and engineers to design and manage the company's information security. (Id.). Thomson Financial also utilized various computer network security measures that included, among other things, password protections, access codes, authentication systems, and dozens of security guards to protect the integrity of the company's and its clients' proprietary information. (Id.).

Thomson Financial provided webcasting services for the October 17, 2007, release of IMS Health's third quarter 2007 earnings information slides ("IMS Health Earnings Information"). (Fox Decl. ¶ 5-6). IMS Health routinely publicized the date, time, and internet location for webcasts and audio casts before it released its earnings reports through Thomson Financial. (Hr'g Tr. at 69-70). As early as October 9, 2007, IMS Health had publicly disclosed that it would announce its third quarter 2007 earnings on October 17, 2007, at 5:00 p.m., on the IMS Health website hosted by Thomson Financial. (Hr'g Tr. at 69-70 and Dorozhko Hr'g Ex. A).

On October 17, 2007, the date of the release, at 8:06 a.m., a computer hacker from Internet Protocol address ("IP address") 83.98.156.219 began probing the IMS Health website at Thomson Financial to "GET" the IMS Health Earnings Information prior to its public release. (Hr'g Tr. at 35 and SEC Hr'g Ex. 2; Mathias Decl. ¶¶ 12, 23-26 and Ex. 1). Since Thomson Financial had not yet received the IMS Health Earnings Information, the hacker's effort was unsuccessful, and the only information the hacker saw was the publicly available "Event Detail," noting that IMS Health was to announce earnings during the webcast and earnings call scheduled for 5:00 p.m. that day. (Hr'g Tr. at 36, 48 and SEC Hr'g Ex. 2; Mathias Decl. ¶ 12). Three times thereafter, at 12:10 p.m., 12:51 p.m., and 1:52 p.m., from the same IP address, the hacker probed

to determine whether the hacker could "GET" the nonpublic IMS Health Earnings Information. (Hr'g Tr. at 38 and SEC Hr'g Ex. 2; Mathias Decl. ¶¶ 13, 23-26 and Ex. 1).

At 2:01 p.m. on October 17, 2007, IMS Health sent Thomson Financial the IMS Health Earnings Information. (Hr'g Tr. at 28-29 and SEC Hr'g Exs. 1, 2). The slides contained confidential material information concerning IMS Health's third quarter 2007 earnings that were to be announced during the earnings call and webcast with investors scheduled for 5:00 p.m. that day. (Fox. Decl. ¶ 6; Hr'g Tr. at 28-29; SEC Hr'g Exs. 1 at p. 9, 2). At 2:08 p.m., after receiving the slides, Thomson Financial prepared the slides and uploaded them to a secure web server where they were staged and held to be posted to IMS Health's website for public viewing at 5:00 p.m. (Hr'g Tr. at 29-31). IMS Health and Thomson Financial expected the IMS Health Earnings Information to remain confidential until 5:00 p.m. and had implemented multiple security measures to prevent unauthorized access to this information before its was released to the public. (Hr'g Tr. at 24, 49-51; Mathias Decl. ¶¶ 15-19).

Thomson Financial expected its security systems and the IMS Health Earnings Information to be secure. (Mathias Decl. ¶ 29). IMS Health and Thomson Financial expected the IMS Health Earnings Information to remain confidential until 5:00 p.m. and had implemented multiple security measures to prevent unauthorized access to this information before its was released to the public, as described below. (Mathias Decl. ¶ 15). Defendant Dorozhko conducted the hacking component of his scheme in such a way as to avoid detection by Thomson Financial's security system. (Mathias Decl. ¶ 28).

Thomson Financial assigned a unique "Client ID" code to identify IMS Health on Thomson Financial's secure computer server. (Mathias Decl. ¶ 16). Thomson Financial also assigned a unique "Event ID" code to identify the event designated for the release of the IMS

6

Health Earnings Information. (Mathias Decl. ¶ 17). A Globally Unique Identifier ("GUID") is a series of random numbers and letters --- approximately 20-40 digits --- generally used in computer programming to provide a unique reference number. (Mathias Decl. ¶ 18). Thomson Financial used a GUID to identify the confidential location of the IMS Health Earnings Information in Thomson Financial's computer network. (Id.). The GUID was hidden and secured from public view by a series of computer programming codes. (Id.).

At all times prior to 5:00 p.m. on October 17, 2007, the IMS Health Earnings Information was highly confidential and secured within the Thomson Financial computer network. (Mathias Decl. ¶ 19). While the Client ID and Event ID were readily apparent to the public on the IMS website, the name and location of the server, the file path, the GUID, and the unique sequence of the entry of all of this data (the "Thomson Financial Proprietary Information") were confidential. (Mathias Decl. ¶ 19). Although Thomson Financial does not have any information showing specifically how defendant Dorozhko obtained or transmitted the Thomson Financial Proprietary Information, defendant Dorozhko clearly made misrepresentations to Thomson Financial's security systems. (Mathias Decl. ¶ 31). Defendant Dorozhko sent the Client ID, the Event ID, and the Thomson Financial Proprietary Information, all in proper sequence such that the Thomson Financial security system was tricked and misdirected into relinquishing to defendant Dorozhko illegal and unauthorized access to the confidential IMS Health Earnings Information. (Mathias Decl. ¶ 31).

At 2:15:01 p.m., within minutes after the slides were uploaded, the hacker again probed the Thomson Financial computer network and this time learned that Thomson Financial had indeed received the IMS Health Earnings Information. (Hr'g Tr. at 37-38; SEC Hr'g Ex. 2). Starting at 2:15:28 p.m., the hacker deceived and infiltrated the Thomson Financial's security

system and began viewing and downloading the unreleased, confidential IMS Health Earnings Information. (Hr'g Tr. at 37-39; SEC Hr'g Ex. 2; Mathias Decl. ¶¶ 21-24). By 2:18:43 p.m., the hacker provided access information to the computer server that allowed him to view and download copies of all the IMS Health Earnings Information. (Id.).

Within half an hour, at 2:52 p.m., defendant Dorozhko began trading for the first time in his account at Interactive Brokers and bought all available October 25 and October 30 put options in IMS Health stock. (Ward Decl. ¶ 10; Hr'g Tr. at 90-93). During the next fifteen minutes, defendant Dorozhko tried to accumulate as many October put options as possible, six times cancelling all or part of open orders, and six times revising his orders or raising his bid. (Ward Decl. ¶¶ 10, 12-13 and Ex. 5). By 3:06 p.m., defendant Dorozhko succeeded in buying 300 October 25 options with a strike price of $25 and 330 October 30 options with a strike price of $30. (Ward Decl. ¶¶ 10, 12-13 and Ex. 5; Declaration of Stephen P. Glascoe dated November 9, 2007 ("Glascoe Decl.") ¶¶ 13-14). These put options had strike prices at or below IMS Health's stock price on October 17, 2007 and would expire on Saturday, October 19, 2007 (at 12:01 a.m.). (Glascoe Decl. ¶¶ 12-14). In order for defendant Dorozhko to profit from his investment, the price of IMS Health stock would have to decrease significantly below the strike prices of the options in less than 8 trading hours. (Glascoe Decl. ¶¶ 12-14).

Defendant Dorozhko's purchases of the October 25 and October 30 options amounted to an investment of $41,670.90, nearly all the money available in his account and was equal to his income for one year and one-fifth of his net worth. (Ward Decl. ¶¶ 4, 7, 11 and Exs. 3-4; Glascoe Decl. ¶ 15). In addition, defendant Dorozhko's purchases represented 96% of the reported volume of the October 25 put option series and 79% of the reported volume of the October 30 put option series on October 17, 2007. (Glascoe Decl. ¶ 16).

8

That day, the market closed at 4 p.m. and IMS Health's stock price closed at $29.56 per share and the trading volume was 832,500 shares. (Glascoe Decl. ¶ 17; Gumagay Decl. ¶ 2 and Ex. A). Thereafter, IMS Health released its third quarter earnings and conducted the 5:00 p.m. webcast and concurrent earnings call. Specifically, IMS Health reported third quarter 2007 earnings of $0.29 per share on a GAAP (Generally Accepted Accounting Principles) basis, which was 28% below the analysts' consensus estimates of approximately $0.40 earnings per share and 15% below the previous year's third quarter earnings of $0.34 per share. (Glascoe Decl. ¶ 18; Gumagay Decl. ¶¶ 8-9 and Exs. G-H).

On October 18, 2007, the market opened at 9:30 a.m. and IMS Health's stock price opened at $22.75 per share. (Ward Decl. ¶ 9). Within four minutes, starting at 9:34 a.m., defendant Dorozhko began selling all of his IMS Health put options. (Gumagay Decl. ¶ 2 and Ex. A, ¶ 10 and Ex. I; Glascoe Decl. ¶¶ 22, 27-28; Ward Decl. ¶ 9). Eight minutes later at 9:42 a.m., he completed his sales and realized proceeds of over $328,000 and net profits of $286,456.59. (Gumagay Decl. ¶ 2 and Ex. A, ¶ 10 and Ex. I; Glascoe Decl. ¶¶ 22, 27-28; Ward Decl. ¶ 9). During that day, IMS Health's stock price plunged 28% to a 52-week low of $21.20 per share on a trading volume of more than 23 million shares, an increase of 2,735% from the previous day's trading volume. (Glascoe Decl. ¶¶ 19-20).

On October 19, 2007, Interactive Brokers began an internal investigation of defendant Dorozhko's trades and froze his account. (Ward Decl. ¶ 14; Hr'g Tr. at 106-108).

## III. ARGUMENT

### A. The Standard For Summary Judgment

Under Fed. R. Civ. P. 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

9

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Under Fed. R. Civ. P. 56(e),

> "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1; other citations omitted).

To carry its initial burden, the SEC, the moving party, needs only identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323 (quoting Fed. R. Civ. P. 56(c)). Courts have granted summary judgment against defendants in cases brought by the SEC. See SEC v. Musella, 678 F. Supp. 1060 (S.D.N.Y. 1988); SEC v. Cavanagh, et al., 2004 U.S. Dist. LEXIS 13372, at *107-09 (S.D.N.Y. July 16, 2004).

## B.     The Proscriptions Of Section 10(b) Of The Exchange Act And Rule 10b-5

Section 10(b) of the Exchange Act and Rule 10b-5 prohibit any person from employing any device, scheme, or artifice to defraud, making misrepresentations or misleading omissions, and engaging in any act, practice, or course of business that operates as a fraud or deceit, in connection

with the purchase or sale of securities.[3] The "in connection" requirement is satisfied when the scheme to defraud and the securities trading "coincide." See SEC v. Zandford, 535 U.S. 813, 822 (2002).

Silence and nondisclosure is fraudulent under Section 10(b) of the Exchange Act and Rule 10b-5 when there is a duty to speak. See Dorozhko, 574 F.3d at 47, 49; Dorozhko, 606 F. Supp. 2d at 324. However, "[e]ven if a person does not have a fiduciary duty to 'disclose or abstain from trading,' there is nonetheless an affirmative obligation in commercial dealings not to mislead." Dorozhko, 574 F. 3d at 49 (citing Basic Inc. v. Levinson, 485 U.S. 224, 240 n.18 (1988)). There is no fiduciary duty requirement on "the ordinary meaning of 'deceptive' where the alleged fraud is an affirmative misrepresentation rather than a nondisclosure." Id. "[M]isrepresenting one's identity in order to gain access to information that is otherwise off limits, and then stealing that information is plainly 'deceptive' within the ordinary meaning of the word." Id. at 51. "Conduct itself can be deceptive," and so liability under Section 10(b) of the Exchange Act and Rule 10b-5 does not require "a specific oral or written statement." U.S. v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008) (citing Stoneridge Inv. Partners, LLC v. Scientific-

---

[3]      Section 10(b) of the Exchange Act "prohibits the use or employ, in connection with the purchase or sale of any security . . ., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5 provides, in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange

(a) To employ any device, scheme, or artifice to defraud

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

Atlanta, Inc., 552 U.S. 148, 158 (2008)). Under Section 10(b) of the Exchange Act, computer hacking may be deceptive where the hacker fraudulently obtained material, nonpublic information used in connection with the purchase or sale of securities." Dorozhko, 574 F. 3d at 44.[4]

Scienter is a required element under Section 10(b) of the Exchange Act and Rule 10b-5. See Aaron v. SEC, 446 U.S. 680, 697 (1980). Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 n.12 (1976). Scienter may be established by circumstantial evidence. See, e.g., Herman & MacLean v. Huddleston, 459 U.S. 375, 390 n.30 (1983) (proof of scienter in fraud cases is often a matter of inference from circumstantial evidence).[5]

Here, defendant Dorozhko gained access to material nonpublic IMS Health Earnings Information by infiltrating, tricking, and misleading Thomson Financial's highly complex and secure computer security systems. This Court was correct in concluding that defendant Dorozhko was the hacker, and his hacking and trading was a "device or contrivance" within the meaning of Section 10(b) of the Exchange Act. See Dorozhko, 606 F. Supp. 2d at 323, 328. Defendant Dorozhko's hacking involved the use of a deceptive device and scheme to (1) conceal his identity, as explained below; and (2) trick and mislead Thomson Financial's computer

---

[4] Whether the information defendant Dorozhko obtained was material and nonpublic does not seem to be in dispute. The 28% market decline in the stock price of IMS Health after the announcement clearly demonstrated that the IMS Health Earnings Information was material and nonpublic at the time of defendant Dorozhko's trades. See, e.g., In re Apple Computer Securities Litigation, 886 F.2d 1109, 1116 (9th Cir. 1989), cert. denied, 496 U.S. 943 (1990) (dramatic price movements in response to optimistic statement provide strong indication that statement was material). Moreover, there appears to be no dispute that this Court has subject matter and in personam jurisdiction .in this case and that venue properly lies with this Court.

[5] This Court concluded that, in light of the close proximity between the hacking and defendant Dorozhko's trading, coupled with his heavy trading in IMS Health put options, defendant Dorozhko is the likely hacker. See Dorozhko, 606 F. Supp. 2d at 323, 326. In addition, this Court determined that (1) defendant Dorozhko's hacking and trading was a "device or contrivance" and "an artifice or scheme" within the meaning of Section 10(b) of the Exchange Act, (citing to in Hochfelder, 425 U.S. at 199); and (2) that Dorozhko's hacking and trading "evidences the required scienter." See id. at 328 (Emphasis added).

network security systems into granting him unauthorized access to the IMS Health Earnings Information, *i.e.*, an affirmative misrepresentation.[6] Defendant Dorozhko communicated the Thomson Financial Proprietary Information as a confidential and unique identifier to the Thomson Financial security systems; he thereby misrepresented his true identity and misled Thomson Financial into giving him unauthorized access to the IMS Health Earnings Information. He then purchased IMS Health securities based on the information he obtained by hacking into Thomson Financial's computer network.

Defendant Dorozhko's deception was intentional, targeted, and involved a high degree of scienter. Defendant Dorozhko intentionally made multiple attempts --- at 8:06 a.m., 12:10 p.m., 12:51 p.m., 1:52 p.m., and 2:15 p.m. --- to obtain unauthorized access to the IMS Health Earnings Information. Defendant Dorozhko specifically targeted Thomson Financial to obtain the IMS Health Earnings Information. Within about seven minutes of Thomson Financial's receipt of the IMS Health Earnings Information, defendant Dorozhko successfully hacked into Thomson Financial's secure computer network and obtained access to the earnings information. To infiltrate Thomson Financial's secure computer network without being detected, defendant Dorozhko concealed his identity and obtained Thomson Financial's internal computer codes. Defendant Dorozhko transmitted these confidential internal computer codes in the proper sequence such that Thomson Financial's computer security system was tricked and misled into treating defendant Dorozhko as if he was authorized to access the confidential IMS Health Earnings Information.[7]

---

[6]     Even if defendant Dorozhko's scheme included an element of theft, this element does not negate the deceptive nature of his fraud. As this Court noted, "[b]oth hacking and traditional theft may involve 'deception' in the common law sense of unauthorized access, whether by using fake ID cards or spoofed internet protocols ...." Dorozhko, 606 F. Supp. 2d at 339.

[7]     Consequently, defendant Dorozhko's actions involved more than exploiting a weakness in an electronic code to gain unauthorized access because, at a minimum, he arranged and then transmitted the internal access codes

Within minutes of successfully tricking and misleading Thomson Financial's computer network, defendant Dorozhko began buying the riskiest and most profitable IMS Health put options that were set to expire in two days. His purchases represented 79% to 96% of the reported volume of the put option series at issue on October 17, 2007. Defendant Dorozhko's purchases amounted to nearly all the money available in his account and equal to his income for one year or one-fifth of his net worth. To profit from his investments, the price of IMS Health stock would have to decrease substantially --- approximately 20% for a large portion of his put options --- within eight trading hours. Defendant Dorozhko's conduct strongly suggests he knew with certainty that, based on IMS Health's Earnings Information he unlawfully obtained from Thomson Financial, IMS Health's stock price would dramatically decline shortly after the earnings announcement. In less than 25 minutes of trading on October 17 and October 18, 2007, defendant Dorozhko profited $286,456.59. (Ward Decl. ¶¶ 8-9).

Thomson Financial has not been able to obtain information showing specifically how defendant Dorozhko obtained or transmitted the Client ID, the Event ID, and the Thomson Financial Proprietary Information, all in proper sequence to trick and mislead Thomson Financial's secure computer network. In addition, defendant Dorozhko has refused to provide any discovery by invoking his rights under the Fifth Amendment. In a civil case such as this, a court is permitted to draw adverse inferences from such an invocation. See Mitchell v. United States, 526 U.S. 314, 328 (1999) ("This Court has recognized 'the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.") (quoting Baxter v. Palmigiano, 425 U.S. 308, 318 (1976)); Collazos v. United States, 368 F.3d 190, 203-04 (2d Cir.

---

in the proper sequence in order to deceive Thomson Financial's security system into giving him access to the confidential IMS Health Earnings Information as if he was authorized to access the information.

2004) (noting that where the defendant "deprives the government of the opportunity to conduct a deposition," that "itself supports an adverse inference as to the criminal source and use of the seized currency.").

The legislative history of Section 10(b) of the Exchange Act shows that Congress intended to empower the U.S. Securities and Exchange Commission to aggressively pursue new types of fraud and deception in connection with securities transactions. See e.g., Hearings on H.R. 7852 and H.R. 8720 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 115 (1934) . The U.S. Supreme Court has interpreted Section 10(b) of the Exchange Act consistent with legislative intent and made clear that Section 10(b) is intended to be a "catch-all" provision reaching all sorts of fraudulent devices, including newly-created types of fraud. Hochfelder, 425 U.S. at 202 (quoting Hearings on H.R. 7852 and H.R. 8720 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 115 (1934) ). "Section 10(b) and Rule 10b-5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws." Superintendent of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6 (1971) (quoting A. T. Brod & Co. v. Perlow, 375 F.2d 393, 397 (2d Cir. 1967)) (Emphasis in original). Defendant Dorozhko's fraudulent scheme to use computer hacking to deceitfully obtain confidential IMS Health Earnings Information and exploit it for purposes of trading seems to be the very "novel or atypical method" of securities fraud that threatens the integrity of our securities markets and is prohibited by Section 10(b) of the Exchange Act and Rule 10b-5.

Defendant Dorozhko's conduct in this case violates Section 10(b) of the Exchange Act and Rule 10b-5. He used a deceptive device and scheme, as described above, to obtain IMS

Health material nonpublic information from Thomson Financial in connection with the purchase of IMS Health securities.

## C. Defendant Dorozhko Should Be Enjoined

The SEC seeks a permanent injunction against defendant Dorozhko for violating Section 10(b) of the Exchange Act and Rule 10b-5. To obtain an injunction, the SEC needs to show that a violation has occurred and there is a "reasonable likelihood" that the defendant, if not enjoined, will engage in future violations. SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 99-100 (2d Cir. 1978). In determining whether to grant an injunction, the factors that a court may consider are (1) the likelihood of future violations; (2) the degree of scienter involved; (3) the sincerity of defendant's assurances against future violations; (4) the isolated or recurrent nature of the infraction; (5) defendant's recognition of the wrongful conduct; and (6) the likelihood, because of defendant's professional occupation, that future violations might occur. SEC v. Universal Major Indus. Corp., 546 F.2d 1044, 1048 (2d Cir. 1976), cert. denied sub nom. Homans v. SEC, 434 U.S. 834 (1977); SEC v. Federated Alliance Group, Inc., 1997 U.S. Dist. LEXIS 9075, at *6 (W.D.N.Y. June 23, 1997); see also, SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1477 (2d Cir. 1996), cert. denied, 522 U.S. 812 (1997) (an injunction is warranted particularly where a violation was founded on systematic wrongdoing, rather than an isolated occurrence, and the defendant's degree of culpability).

Defendant Dorozhko will likely violate the federal securities laws again and his misconduct exhibited a high degree of scienter. His misconduct was not an isolated occurrence but rather was founded on systematic and highly coordinated wrongdoing. Defendant Dorozhko's repeated probing of IMS Health's website and rapid viewing and downloading of the company's confidential information show that his conduct was deliberate and intentional.

16

Within minutes of obtaining unauthorized access to Thomson Financial's computer network, defendant Dorozhko was able to quickly decipher the significance of the third quarter earnings data vis-à-vis analyst earnings expectations. Defendant Dorozhko's motive was clear. Shortly after obtaining unauthorized access to Thomson Financial's computer network, he placed risky, highly profitable put option trades based on his advance knowledge of IMS Health's third quarter 2007 earnings information. Defendant Dorozhko essentially "cornered" the October put option market by accumulating 79% to 96% of the reported volume on October 17, 2007. With the sophistication of a seasoned option trader, defendant Dorozhko cancelled all or part of open orders, revised orders, and raised bids, presumably to obtain the maximum number of put options at the best possible prices. In addition, defendant Dorozhko's fraud was designed to deceive Thomson Financial's computer network security and to evade detection. Defendant Dorozhko's fraud appears to be well-orchestrated, highly sophisticated, and, when conducted through the complex world of cyberspace, offered him a high degree of anonymity. Based on the serious and systematic nature of the fraud, it is reasonable to infer a likelihood of future violation.

There is no assurance that defendant Dorozhko would not commit future violations of the federal securities laws and he clearly does not recognize the wrongfulness of his conduct. When confronted with the allegations of unlawful trading against him in this case, defendant Dorozhko asserted his Fifth Amendment rights against self-incrimination and chose not to provide any information. Defendant Dorozhko is nowhere to be found and has never appeared in person throughout this Court's proceedings. Recently, his counsel informed this Court that defendant Dorozhko has disappeared and his counsel was unable to contact him or his agent. Defendant Dorozhko is likely to commit future violations of the federal securities laws if not enjoined.

The deterrence of an injunction is clearly warranted in this case.

17

## D.      Defendant Dorozhko Should Pay Disgorgement And Prejudgment Interest

The courts have long recognized that disgorgement of illegally obtained profits is an

appropriate remedy for violations of the federal securities laws. See, e.g., SEC v. Tome, 833

F.2d 1086, 1096 (2d Cir. 1987), cert. denied sub nom. Lombardfin S.p.A. v. SEC, 486 U.S. 1014

(1988) (quoting SEC v. Blavin, 760 F.2d 706, 713 (6th Cir. 1985)) ("Once the Commission has

established that a defendant has violated the securities laws, the district court possesses the

equitable power to grant disgorgement."). "Disgorgement is an equitable remedy designed to

deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities

laws." SEC v. First City Fin. Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989). As explained in

First City, "disgorgement is rather routinely ordered for insider trading violations despite a ...

lack of specific authorizations for that remedy under the securities law." Id.

The Court should further award prejudgment interest on defendant Dorozhko's

disgorgement. Such an award is intended to deprive a wrongdoer of any actual or imputed

economic benefit from his ill-gotten gains and is a proper exercise of judicial discretion. See

Rolf v. Blyth, Eastman Dillon & Co., 637 F.2d 77, 86 (2d Cir. 1980); Norte & Co. v. Huffines,

416 F.2d 1189, 1191 (2d Cir. 1969), cert. denied sub nom. Muscat v. Norte & Co., 397 U.S. 989

(1970). An award of prejudgment interest, like an award of disgorgement, will deprive

defendant Dorozhko of his ill-gotten gain and will prevent his unjust enrichment. See, e.g., SEC

v. Stephenson, 732 F. Supp. 438, 439 (S.D.N.Y. 1990). Defendant Dorozhko's personal

wrongdoing justifies an award of interest in accord with the doctrines of fundamental fairness.

E.g. Norte & Co., 416 F.2d at 1191. Indeed, in the context of Section 10(b) and Rule 10b-5

actions, proof of a defendant's scienter is sufficient to justify an award of prejudgment interest.

See SEC v. Musella, 748 F. Supp. 1028, 1043 (S.D.N.Y. 1989) (citing Rolf, 637 F.2d at 87).

Here, defendant Dorozhko's trading account at Interactive Brokers has a balance of $336,077.69 as of December 31, 2009. (Third Declaration of Paul A. Gumagay dated January 30, 2010 ("Third Gumagay Decl.") ¶ 4 and Ex. C). He realized net profits of $286,456.59 from his unlawful trades in IMS Health put options. Thus, defendant Dorozhko's ill-gotten gains was 85.24% of the balance in his account as of December 31, 2009 ($286,456.59/$336,077.69 = 85.24%). Since Interactive Brokers made a total interest payment of $8,131.09 in defendant Dorozhko's account, (Third Gumagay Decl. ¶ 5 and Ex. D), $6,930.94 ($8,131.09 x 85.24% = $6,930.94) of this interest payment is subject to the SEC's claim for prejudgment interest.

The amount of defendant Dorozhko's illegal profits, or disgorgement, is $286,456.59 plus prejudgment interest of $6,930.94.

### E.      Defendant Dorozhko Should Pay Civil Money Penalties

Section 21A(a)(2) [15 U.S.C. 78u-1(a)(2)] of the Exchange Act provides, among other things, that a court may levy a civil penalty of up to three times the profit gained by unlawful trading. Congress intended the penalty to serve as a deterrent mechanism because disgorgement alone "merely restores a defendant to his original position without extracting a real penalty for his illegal behavior." H.R. Rep. No. 98-355, 98th Cong., 2d Sess., 7-8 (1984), reprinted in 1984 U.S.C.C.A.N. 2274, 2280-81, as cited in SEC v. Shah, 1993 U.S. Dist. LEXIS 10347, *17-18 (S.D.N.Y. July 28, 1993). "The elements to consider in determining the penalty include the defendant's culpability, the amount of profits gained, the repetitive nature of the unlawful act and the deterrent effect of a penalty given the defendant's net worth." SEC v. Sekhri, 2002 U.S. Dist. LEXIS 13289, at 53-54 (S.D.N.Y. July 22, 2002) (Patterson, J.) (award of treble penalty); see also, SEC v. Ferrero, 1993 U.S. Dist. LEXIS 21379, at *52-54 (S.D. Ind. Dec. 2, 1993), aff'd sub nom. SEC v. Maio, 51 F.3d 623 (7th Cir. 1995) (same).

Here, defendant Dorozhko meets all of the criteria for the maximum civil monetary penalty. He acted surreptitiously to profit from his infiltration into Thomson Financial's computer network to obtain IMS Health's confidential information. Defendant Dorozhko, through deception, gained unauthorized access to Thomson Financial's secure computer network on October 17, 2007, ultimately obtaining IMS Health's third quarter 2007 earnings information. Based on that information, defendant Dorozhko made multiple put option trades and profited $286,456.59 in ill-gotten gains. Defendant Dorozhko has refused to participate in discovery and there is no evidence mitigating his culpability or otherwise suggesting he now appreciates the wrongfulness of his conduct.

The SEC respectfully urges the Court to enter judgment for the maximum civil penalty (three times disgorgement), which is $859,369.77.[8]

## CONCLUSION

For the reasons stated above, the SEC respectfully requests that this Court enter an order in the form attached hereto (i) permanently enjoining defendant Dorozhko from further violations of Section 10(b) of the Exchange Act and Rule 10b-5; (ii) requiring defendant Dorozhko to disgorge his ill-gotten gains and prejudgment interest on that amount; and (iii) imposing civil penalties on defendant Dorozhko equal to three times his ill-gotten gains.

---

[8] The maximum civil penalty is three times the illegal profits of $286,456.59.

Dated: January 31, 2010                    Respectfully submitted,


_Robert B. Blackburn_                       _[signature]_
Robert B. Blackburn (RB 1545)              Christopher R. Conte
Local Counsel                              Charles E. Cain
U.S. Securities and Exchange Commission    Christine E. Neal
3 World Financial Center, Room 4300        Paul A. Gumagay (PG0805)
New York, New York 10281-1022              Suzanne E. Ashley
(212) 336-1050                             Adam J. Eisner
(212) 336-1317 (Fax)                       Attorneys for Plaintiff
                                           U.S. Securities and Exchange Commission
                                           100 F Street, N.E.
                                           Washington, DC 20549-4030
                                           (202) 551-4443 (Gumagay)
                                           (202) 772-9233 (Fax)